**Rex ALLEN, Jr., Plaintiff–Appellant,**

v.

**Jim WATSON and Charles Morrisett, Defendants–Respondents.**

No. 20360.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 15, 1996.

Robert R. Paulson, II, Branson, for plaintiff-appellant.

Charles J. Fain, Branson, for defendants-respondents.

PARRISH, Judge.

Rex Allen, Jr., (plaintiff) appeals a judgment entered in favor of Jim Watson and Charles Morrisett (hereafter sometimes collectively referred to as defendants), following a jury trial, in an action for breach of contract. Plaintiff contends he was entitled to judgment as a matter of law; that the trial court erred in not granting a directed verdict or judgment notwithstanding the verdict regarding the existence of a contract. This court affirms.

Plaintiff is a country music entertainer. He was the host of a radio show, Branson Gold, that originated from Branson, Missouri. Mickey Ambrosia was the producer of Branson Gold. Plaintiff was interested in having a theater show in Branson. He discussed his plans with Ambrosia and offered Ambrosia a finder's fee "for putting a deal together for a theater." Ambrosia was to receive a finder's fee of three percent of whatever plaintiff made.

Ambrosia was acquainted with defendants. He and defendants were residents of Piggott, Arkansas. Ambrosia hoped to persuade Morrisett and Watson to finance a theater for plaintiff.

Plaintiff was scheduled to perform in Branson in October 1992. Morrisett's daughter, Leslie, wanted to pursue a music career. Ambrosia knew Morrisett was interested in furthering Leslie's career. He arranged for Leslie Morrisett to sing in plaintiff's show on October 31.

Plaintiff was traveling from his home in Nashville to Branson for his show. He stopped in Piggott. Ambrosia took plaintiff to Watson's office. Watson was in the real estate business. He was surprised when Ambrosia brought plaintiff to his office. The visit was not a business meeting. There was no discussion concerning Watson investing in plaintiff's show or providing financial backing.

Watson and his wife were friends of Morrisett and his wife. The Watsons had known Leslie while she was growing up in Piggott and were familiar with her music career aspirations. They planned to accompany the Morrisetts to Branson and attend plaintiff's show the evening Leslie was scheduled to appear, October 31.

Defendants and their wives attended the October 31 show. Ambrosia invited them to meet plaintiff and members of the band before the show started. Watson explained, "It was just—you know, just a casual meeting, and we just was able to see Rex Allen, Junior, and his band members, and it was just casual talk as I guess there normally would be. There was—it was not a business meeting."

The meeting at the theater on October 31 was the first time Morrisett met plaintiff. After that evening, Ambrosia contacted him several times. Morrisett explained:

> ... [F]rom that time, maybe a month past that, or two weeks past that, they were trying to buy these theaters. There wasn't a thing said about me investing. It was my daughter was going to—if they got one, he was going to get—let—she'd get to perform in it.

Morrisett testified:

Q. Now, you say they were trying to buy theaters. Who was trying to buy theaters?

A. Well, my impression through the thing was him and Rex Allen, because it was like the Jubilee one time, I think the Christy Lane one time, the Honeycomb one time, and then the one in the mall one time. There were three or four different theaters they was going, according to him, that they were going to purchase or were looking at. He didn't say they were going to purchase them. It was either rent them or have—

Q. —Now, you say "according to him". Who is "him"?

A. Mickey Ambrosia.

In January or February 1993, Ambrosia invited Morrisett to go to Nashville with him, Burt Jones, the owner of a recording studio, and a friend of Jones, Gary Scott. Ambrosia talked to Jones and Scott about looking for a theater. Morrisett testified that he heard the discussion but said nothing about wanting a theater.

Ambrosia, Jones, Scott and Morrisett attended a show where plaintiff performed. After the show they went to plaintiff's house. Ambrosia testified that the house where plaintiff lived was being sold; that plaintiff was in the process of moving to Branson. Ambrosia explained, "I stopped over because I needed to talk to Rex, and he was in the process of moving at the time. I wanted to see if I could help."

Jim Watson's first business contact with Ambrosia was in the latter part of January or early February. He was invited to come to Branson to speak to people who owned the Branson Gold radio show. They were looking for investors in the radio show. Watson was not interested.

Some time later Ambrosia initiated discussions with defendants concerning their financing plaintiff's show in Branson. Ambrosia received correspondence from plaintiff concerning a proposal that included defendants providing a theater in Branson in which he would perform and establishing a schedule for his appearing there and a rate of compensation for his performances. Am-

brosia explained, "[I]t was the start of a negotiation." He faxed the correspondence to Watson.

Defendants received the correspondence sometime in mid-February. They discussed it and determined there were some parts of the proposal that were unacceptable to them. On March 1 plaintiff called Watson and told him it was time to finalize their arrangements. Watson recalled plaintiff telling him, "If you're going to make a proposal, we need to get it done."

Defendants made a proposal to plaintiff that day. Watson typed the proposal. It was signed and a copy faxed to plaintiff. After plaintiff received the proposal, he again called Watson. Watson testified:

He got the fax and called me and says there was some changes that he wanted to make in regard to the number of days that he would be working, and that was in the month of November, the month of December, and also starting again in February, mid-February through March the 31st, and he said[,] "Can—will you go along with that?" And, I said[,] "I don't even know what you're wanting." He said[,] "I will scratch through and I will line these through there and I will send it back to you", which he did.

And, he says[,] "Is that acceptable?" I said[,] "Now wait a minute. I can't—I can't approve anything without Charles approving it also because he's a partner in this thing. He's going to put in just as much money as I am, and I can't tell you that he will go along with this. I'll have to check with him."

Plaintiff made changes in the proposal he received from defendants. Jim Watson described the changes and his response to plaintiff:

This change involved—well, as I've calculated up, it involved 40 shows, and we had—we had talked about a pay schedule. I wasn't unhappy with the pay schedule. I thought it was ridiculous when he first submitted it, you know, for anybody to make that much money, is just beyond me. I just couldn't believe that entertainers make that much money I guess, but—and

our proposal cut in half or less of what he originally offered. I thought[,] "Well, maybe we're doing a good job here." I don't know. This is the first time I've ever been involved in negotiations of a—with a music star.

He undoubtedly was real tickled with that, because he was—he was pleased with the salary structure, but his contention was he was changing days, and it changed 40 days on this structure that we had. Even at the lowest amount of $600.00 per show, that would have been $24,000.00 additional, and I was not going to approve that without Mr. Morrisett's approval, and I told him so on the phone, . . . .

Watson was asked, "Did you and Mr. Morrisett ever approve those changes." He answered, "No, we did not!"

Defendants later met with plaintiff in Branson. They were to spend the night at a condominium Ambrosia had there. Jim Watson testified about what occurred at the meeting:

Q. Now, you just first tell the jury what transpired at that condo, if you can, sir. What conversations were had in regard to the money?

A. We discussed amount of money that we had to invest. Mr. Morrisett said[,] "I have $50,000.00 to invest, win, lose, or draw. That's what I've got to put in there." I said[,] "I've got $15,000.00, but I have borrowed $35,000.00 from the bank, and I will invest fifty thousand also with Mr. Morrisett", and that's all we had, and I even made the statement that if I went beyond that I would even affect my son's college—savings for college, and I was not going to do that, who—he was in high school at that time.

Q. What did Mr. Allen respond, if anything?

A. Mr. Allen never told us that that would not work, nor did Mickey Ambrosia ever tell us that that wouldn't work. I'm really surprised at this point that everybody now is an expert telling us that you can't put a theater on and open it with $100,000.00 when it was sure funny that back then they were all standing around with their hand out.

Defendants leased a theater. They entered into a lease agreement dated March 18, 1993, with Dale Crawford and Dana Crawford as lessors. It provided for the lease of "premises known as *Kirkwood Theater* located within the Kirkwood Motor Inn in Branson, Taney County, Missouri."

The theater opened April 6, 1993. It had seating capacity of approximately 700 people. It was the first theater to open in Branson that year. There were two shows on opening day, an afternoon and an evening show. The afternoon attendance was 64 people.

Jim Watson went to plaintiff's dressing room after the afternoon show. He testified:

[B]etween the afternoon show and the night show I went back to Mr. Allen's dressing room, and he and his wife were back there, and I says[,] "Rex, we've got to do something. You all told me we would have a minimum of 200. You told me you'd have it 60 to 70 percent full. We cannot continue this. We're going to have to close the show, or we're going to have to cut it back and work weekends, or we're going to have to just move back a month. There's not enough people here to support it. We cannot—we've already spent our money. We cannot operate the show. There's not any more money left. I don't have any more money to put in it."

. . . So, I—when—but when I was talking to him I said[,] "We've got to shut the show down or else go back to weekends only." He says[,] "You can't do that. We're going to lose our enter—we're going to lose our singers. We're going to lose our band."

Plaintiff told Watson to "see Mickey" if he had money problems. Watson went to the back of the theater and sat down. A short time later Mickey Ambrosia came to him. Watson told Ambrosia that if they could not get people to the show, they would have to close. He told Ambrosia, "I am not putting another penny in it. If you can operate it, that's fine, but I'm not putting any more money in it."

The evening attendance was 74. Attendance continued to be low throughout the remainder of the month.

On April 29, plaintiff called Watson and told him they needed to talk. A few days later, defendants and their wives drove to Branson and met with plaintiff and the theater manager, Brenda Ray. Watson testified, "[W]e told them at that time we did not have any more money at all, and if they worked any more, they would be on their own." Plaintiff asked defendants not to close; to give them an opportunity to get some other investors. Defendants agreed to not close that day. On May 10, however, the theater manager gave notice, at defendants' direction, to plaintiff and to the theater owners that they were closing that night.

Plaintiff continued operating his show for an additional four to six weeks. He arranged with the theater owners to use the theater. The theater owners were paid a percentage of gate receipts from each performance.

Plaintiff moved for a directed verdict at the close of plaintiff's evidence and at the close of all evidence on the issue of whether there was a contract between plaintiff and defendants. Plaintiff requested the trial court to find "that a contract between Rex Allen, Junior, and Charles Morrisett and Jim Watson [did] in fact exist." Those motions were denied.

Plaintiff filed a motion entitled "Motion For Judgment Notwithstanding The Verdict Of The Jury, Or In The Alternative, For New Trial" in which he asserted the trial court erred when it denied his motions for directed verdict at the close of plaintiff's evidence and at the close of all evidence as to whether there was a contract between the parties. That motion was denied.

Plaintiff presents two points on appeal. Point I contends "[t]he trial court erred when it denied plaintiff's motion for directed verdict on the issue of whether a contract existed between the parties." It asserts "that defendants admitted they had an agreement with plaintiff, and the uncontroverted evidence established a contract existed between the parties."

Point II is directed to the trial court's denial of plaintiff's motion for judgment notwithstanding the verdict. It asserts the trial court erred in denying the motion because the "evidence including judicial admissions by defendants supported a verdict for plaintiff."

Plaintiff's allegations of error will be considered together. Appeals from trial court denials of motions for judgment notwithstanding the verdict are treated the same as appeals from denials of motions for directed verdict. *Norris v. Jones,* 687 S.W.2d 280, 281 (Mo.App.1985). In its review this court accepts the evidence and reasonable inferences favorable to the verdict. Contrary evidence is disregarded. *Bayne v. Jenkins,* 593 S.W.2d 519, 521 (Mo. banc 1980).

A trial court may sustain a defendant's motion for directed verdict only when the facts in evidence and the reasonable inferences which can be drawn therefrom are so strongly against a party that no room is left for reasonable minds to differ. *Meridian Enterprises Corp. v. KCBS, Inc.,* 910 S.W.2d 329, 331 (Mo.App.1995). Likewise, a motion for judgment notwithstanding the verdict should be granted only when all evidence and reasonable inferences to be drawn therefrom are so strong against the prevailing party that there is no room for reasonable minds to differ. *Wiegers by Evans v. Fitzpatrick,* 766 S.W.2d 126, 128 (Mo.App. 1989).

Plaintiff's allegations of trial court error are directed to the issue of whether there was a contract between the parties. The existence of a contract is but one of four elements required to recover in an action for breach of contract. In addition to showing the existence of an agreement, plaintiff was required to show the terms of that agreement; that defendants breached the agreement; and, as a result, that he was damaged. *E.A.U., Inc. v. R. Webbe Corp.,* 794 S.W.2d 679, 685 (Mo.App.1990). As explained in *Vandever v. Junior College Dist. of Metropolitan Kansas City,* 708 S.W.2d 711, 716 (Mo.App.1986), "Plaintiff's proof of a breach of contract claim required proof that a con-

tract existed between the parties, that the plaintiff had certain rights and the defendant certain obligations thereunder, that defendant breached the contract, and that the plaintiff suffered damages therefrom."

■ Plaintiff bases his claims of error on Charles Morrisett's testimony. Morrisett was asked the following questions by plaintiff's attorney and gave the following answers:

Q. Have you ever seen anything that would indicate that Rex Allen, Junior, did not have a contract?

A. That he did not have a contract?

Q. Yes, sir.

A. No, we had an agreement.

Plaintiff contends this testimony established his claim that there was a contract; that the March 1, 1993, fax, as modified by him, was the contract terms.

■ Plaintiff relies on Morrisett's testimony to establish both Point I and Point II. In Point II he characterizes the testimony as a "judicial admission."

A judicial admission has been defined as a more or less formal act done during a judicial proceeding which waives or dispenses with the production of evidence and concedes for litigation purposes that a certain proposition is true. *Hewitt v. Masters*, 406 S.W.2d 60, 64 (Mo.Div. 2 1966). Or, as Wigmore says, a judicial admission "is, in truth, a substitute for evidence, in that it does away with the need for evidence." 9 Wigmore, Evidence § 2588 (Chadbourn rev. 1981).

*Wild v. Consolidated Aluminum Corp.*, 752 S.W.2d 335, 338 (Mo.App.1988). "If a party testifies unequivocally and understandingly to a material fact peculiarly within [his or] her own knowledge, which testimony negates [his or] her right of action, the effect is that of a judicial admission which may not be contradicted by any other evidence." *Beck v. Edison Bros. Stores, Inc.*, 657 S.W.2d 326, 328–29 (Mo.App.1983). In considering if a party's testimony amounts to a judicial admission, that testimony must be considered as a whole. *Tuchschmidt v. Canavan*, 588 S.W.2d 33, 35 (Mo.App.1979). To be relied on as an admission, testimony must be clear and unqualified. *Id.*

Charles Morrisett's testimony was that he and Jim Watson had not agreed to the terms proposed in plaintiff's modified copy of the fax they sent him on March 1. His testimony, and that of Watson, was that they agreed to invest $100,000—$50,000 each; that plaintiff and the promoter who introduced them to plaintiff were told that was the total funds they would provide to open and operate the Branson theater.

In order to have granted plaintiff's motion for directed verdict[1] and motion for judgment notwithstanding the verdict, the trial court would have had to find that the evidence conclusively established plaintiff had a contract with defendants; that its terms were those specified in the March 1 fax correspondence as modified by plaintiff. Morrisett testified that the parties had an agreement. However, he did not testify that the terms of the agreement he said existed were the terms plaintiff proposed (nor was the jury asked to find that those were the terms of an agreement between the parties[2]).

There was evidence from which the jury could have found that defendants had an agreement with plaintiff to provide a set

---

1. No issue is raised in this appeal concerning whether a request for "directed verdict" is proper with respect to only one of several elements required to be proven in order to recover on a particular cause of action. Failure to address that question should not be understood to mean that this court finds that to be a proper procedure. The question, not having been raised, need not be, and is not, addressed in deciding this appeal.

2. The verdict-directing instruction given to the jury was provided by plaintiff. It states:

Your verdict must be for plaintiff if you believe:
First, plaintiff and defendants entered into an agreement whereby plaintiff agreed to perform at defendants' theater, and defendants agreed to pay plaintiff for his services, and
Second, plaintiff performed his agreement until prevented from further performing by defendants' actions, and plaintiff was ready to perform the remainder of the agreement, and
Third, defendants failed to perform their agreement, and
Fourth, plaintiff was thereby damaged.

amount of money to open and operate a theater and that they performed that agreement. Morrisett's testimony, considered in its entirety, is consistent with such a finding.

In order for the trial court to have granted a directed verdict or a judgment notwithstanding the verdict, it would have had to find that the evidence clearly and unequivocally established that plaintiff and defendants reached an agreement, the terms of which were the same as the provisions of the March fax correspondence as altered by plaintiff. *See J.A. Tobin Const. Co. v. State Highway Comm'n of Missouri*, 680 S.W.2d 183, 190 (Mo.App.1984). There was substantial evidence to the contrary. The trial court did not err in failing to grant the motions. The judgment is affirmed.

MONTGOMERY, C.J., and SHRUM, J., concur.