THE EMPIRE DISTRICT ELECTRIC
COMPANY, Appellant,

v.

Douglas L. COVERDELL and
Coverdell Enterprises, Inc.,
Respondents,

and

City of Branson, Appellant.

Nos. SD 30560, SD 30557.

Missouri Court of Appeals,
Southern District,
Division One.

June 3, 2011.

Motion for Rehearing or Transfer
Denied June 28, 2011.

Application for Transfer
Denied Aug. 30, 2011.

Mark A. Fletcher, Springfield, for Empire Elec. Dist. Co.

James E. Meadows and Jennifer R. Growcock, Springfield, for City of Branson.

Robert W. Cockerham, Christopher J. Seibold, Samuel John Vincent, III, St. Louis, MO, James H. Arneson, Springfield, MO, for Douglas L. Coverdell and Coverdell Enterprises, Inc.

Before BARNEY, P.J., LYNCH, J., and BURRELL, J.

PER CURIAM.

The Empire District Electric Company ("Empire") and the City of Branson, Missouri ("Branson"), separately appeal from the trial court's "Judgment" entered on January 14, 2010 ("the 2010 Judgment"), arising out of a quiet title action. The 2010 judgment found that Douglas L. Coverdell ("Mr. Coverdell") and Coverdell Enterprises, Inc. ("Coverdell Enterprises") (collectively "Respondents") were the fee simple owners of certain properties located on a peninsula bounded by Roark Creek and Lake Taneycomo in Branson, Missouri, and certain other property apparently located on an adjacent tract to the south of the peninsula. The 2010 Judgment of the trial court is reversed and remanded as to both Branson and Empire.[1]

The genesis of this litigation arose on July 18, 2003, when Empire, successor in interest to Ozark Power and Water Company ("Ozark Power"), filed a "Petition to Quiet Title" against Branson; The Branson Paper, Inc.; Mr. Coverdell and his wife, Julia A. Coverdell ("Mrs. Coverdell"); Coverdell Enterprises; B'Cuz, Inc.; Keycom International, Inc.; Henry Griffin ("Attorney Griffin"); Peter Rea ("Mr. Rea"); and Darlene Rea ("Mrs. Rea"). In this petition, Empire alleged, *inter alia*, that it was the fee owner of a piece of property containing 3.36 acres it described as that land conveyed by Annie I. Compton along with other heirs of the estate of Henry H. Compton to its predecessor in interest, Ozark Power, in 1913 ("the Compton Deed"). As best we discern from the record, this piece of property largely consisted of the eastern portion of the peninsula at issue as well as a section of the western portion of the peninsula, designated as "Property 1" in Empire's petition.[2] Empire also alleged it was the fee owner of a second piece of property referred to in the petition as "Property 2," which was conveyed to Ozark Power on May 14, 1913, by The Branson Town Company.[3] Fur-

---

1. Empire and Branson brought separate appeals; however, they have been consolidated by this Court for purposes of this opinion.

2. Empire's petition described Property 1 as follows:

   [a]ll that part of the Southeast Quarter of the Northwest Quarter and of the Northeast Quarter of the Southwest Quarter of Section 33, Township 23 North, Range 21 West described as follows: Beginning at a point on the left bank of White River in said Northeast Quarter of the Southwest Quarter, said point being 250 feet South of the north line of said Northeast Quarter of the Southwest Quarter; thence West to a point on the high bench, 268 feet distance from the high bank of White River; thence on azimuths from magnetic north, North 13 [degrees] 48 [minutes] West 258 feet; thence North 8 [degrees] 50 [minutes] East,

346 feet; thence South 11 [degrees] 21 [minutes] West to an intersection with the east bank of Roark Creek; thence along the east and south banks of Roark Creek to its confluence with White River; thence following the meander of said river bank to the Point of Beginning. Excepting a strip 80 feet wide along the said river bank in said Northeast Quarter of the Southwest Quarter not belonging to the estate of said Henry H. Compton.

3. Property 2 was described in the petition as follows:

   [b]eginning at a point on the left bank, descending of White River, where the Quarter Section line of Section 33, Township 23, Range 21, running east and west, intersects said bank, more particularly marked by two Sycamore trees, bearing three vertical axe marks; thence West 80 feet to a point; thence South 250 feet to a point, thence

ther, Empire alleged that on April 14, 1927, Ozark Power, "as owner of Property 1 and Property 2, conveyed such properties and others . . ." to Empire such that Empire "is the owner in fee simple of Property 1 . . . and Property 2."

Empire's petition then set out that the defendants named in its petition "may claim some interest in and to Property 1 and/or Property 2, which claim is adverse, prejudicial and junior to that of [Empire], but which represents an improper and invalid cloud on [Empire's] title." Empire then recited the respective legal descriptions and chains of title to properties it described as "Property 3," "Property 4," "Property 5" and "Property 6." Empire contended that the legal descriptions and title holders of the aforementioned properties infringed on Empire's unfettered fee simple title to its legally owned Property 1 and Property 2. Empire then prayed, *inter alia*, that the trial court "quiet fee simple title of Property 1 and Property 2 in and to [Empire] . . . and forever bar [the named defendants], their successors or as-

signs, or anyone on their behalf, from any right, title or interest in Property 1 and Property 2. . . ."

On June 10, 2004, Respondents filed an "Answer and Counterclaim" in which they asserted they had fee simple ownership "to all the . . . property described in [Empire's] Petition" as well as all the property set out in their attached "Exhibit A," which as best we discern set out the legal description for the eastern portion of the peninsula.[4] They also asserted title to the aforementioned property by way of adverse possession.

In July of 2004, Branson filed both an Answer and a Third Party Petition naming as defendants all the original parties named in Empire's Petition, including Empire and Respondents together with Joseph Chenworth, Lillian E. Compton, Karen Rea and "anyone else having or claiming any interest in the real estate." It asserted ownership of "all properties described in [Empire's] Petition" based on legal title as well as adverse possession.

West 188 feet to an iron stake; thence South 17 [degrees] 42 [minutes] East a distance of 360.4 feet to an iron stake; thence South 21 [degrees] 29 [minutes] East a distance of 377.5 feet to an iron stake; thence South 27 [degrees] 40 [minutes] East a distance of 378.6 feet to an iron stake; thence North 79 [degrees] 30 [minutes] East a distance of 85.3 feet to an iron stake on the left bank descending of White River; thence upon the same course North 79 [degrees] 30 [minutes] East a distance of 10 feet to the edge of left bank of White River descending; thence along said bank with the meanderings of White River to the Point of Beginning. All lying in Section 33, Township 23, Range 21, in Taney County, Missouri, containing 5.75 acres more or less.

4. The legal description set forth in Exhibit A reads, in pertinent part, as follows:

COMMENCING AT THE NORTHEAST CORNER OF PARK ADDITION TO [BRANSON] . . . THENCE N 02 [degrees] 29 [minutes] 46 [seconds] W ALONG THE ESTAB-

LISHED PROPERTY LINE . . . 27.80 FEET TO A SET REBAR BEING THE POINT OF BEGINNING, THENCE CONTINUE N 02 [degrees] 29 [minutes] 46 [seconds] W. 749.81 FEET TO A REFERENCE POINT ON THE TOP BANK OF THE MOUTH OF ROARK CREEK, THENCE CONTINUING N 02 [degrees] 29 [minutes] 46 [seconds] W TO THE FLUCTUATING WATERS EDGE OF SAID ROARK CREEK, THENCE EASTERLY AND SOUTHERLY ALONG THE FLUCTUATING WATERS EDGE OF ROARK CREEK AND LAKE TANEYCOMO TO A POINT BEING S 89 [degrees] 41 [minutes] 34 [seconds] E OF THE POINT OF BEGINNING, THENCE N 89 [degrees] 41 [minutes] 34 [seconds] W TO A SET REBAR BEING A REFERENCE POINT ON THE BANK OF SAID LAKE TANEYCOMO, THENCE N 89 [degrees] 41 [minutes] 34 [seconds] W, 242.06 FEET TO THE POINT OF BEGINNING, AND BEING SUBJECT TO ALL OWNERSHIP RIGHTS AND FLOWAGE EASEMENT RIGHTS OF EMPIRE. . . .

The properties at issue were the subject of various deeds and appear to have once been part of the same tract of land. As best we discern, the chain of title relied on by Empire consisted of the 1913 Compton to Ozark Power deed which, according to Empire, conveyed the entire peninsula to Ozark Power;[5] the May 14, 1913, deed from The Branson Town Company to Ozark Power; and an April 14, 1927, warranty deed from Ozark Power to Empire.[6] Also, as best we discern, the chain of title relied upon by Respondents started with a July 14, 1917, conveyance of the peninsula by the Comptons to W.H. Malone. The property was then conveyed by *mesne* conveyances to Ralph McBride, who on February 15, 1957, made a conveyance to W.F. Hoke and Vera Hoke ("the Hokes").[7] The Hokes then divided the peninsula into uneven western and eastern sections.

On April 20, 1972, the Hokes conveyed the following property, referred to in Empire's petition as "Property 4," to Henry J. and Marjorie A. Cordes by "GENERAL WARRANTY DEED:"

[a] tract of land being a part of the Southeast Quarter of the Northwest Quarter and a part of the Northeast Quarter of the Southwest Quarter of Section 33, Township 23 North, Range 21 West, being more particularly described as follows: Beginning at the NE corner of Park Addition to [Branson] thence North 2 [degrees] 19 [minutes] West to the Southerly Bank of Roark Creek; thence in a Southerly direction with the Easterly and Southerly bank of said Roark Creek to the Northerly line of said Park Addition; thence Easterly to the point of beginning all bearings being referenced to the centerline of Sycamore Street as being due North and South....

In turn, this property was ultimately conveyed to Branson.

The remainder of the Hokes property was conveyed by the Hokes via "QUIT CLAIM DEED" to Tori, Inc., an entity in which Mr. and Mrs. Rea held an interest. The description of this property conveyed by the Hokes to Tori, Inc. is referred to in

**5.** This deed was the subject of much discussion at trial. Empire contended at trial as it does in its appeal that based on the four corners of the Compton deed, the Comptons conveyed fee title to Ozark Power and reserved an easement for a ferry operation. It was Respondents' theory, then as now, that the intent of the Compton deed was merely to convey property to be submerged, that the Comptons retained fee simple title to all land not to be submerged, and that Respondents, thus, owned the land in fee simple title through their chain of title.

**6.** Additionally, due to the forthcoming dam construction in the area, on August 31, 1936, J.E. and Louvesta Malone conveyed a "FLOWAGE DEED" to Empire, which effectively gave Empire "the absolute, exclusive and indefeasible right to have, hold and enjoy said flowage right and water privileges forever."

**7.** Empire's petition refers to the property that was the subject of this conveyance as "Prop-

erty 3." As previously related, Empire contends that the legal description of Property 3 together with Property 4, Property 5 and Property 6, described below, may have infringed on Empire's unfettered title to their claimed Property 1 and Property 2. In this connection Property 3 is described as follows:

[a]ll that part of the SE¼ of the NW¼ situate[d] on right bank of Roark Creek, and that part of the NE¼ of the SW¼ beginning at a point on the line between the NE¼ of the SW¼ and the SE¼ of the NW¼ in Section 33, Township 23, Range 21, 80 feet west of two sycamore trees, thence a southerly direction with meanderings of White River 250 feet, thence west to southerly bank of Roark Creek, thence in a northeasterly direction along the bank of Roark Creek to line between NE¼ of the SW¼ and SE¼ of the NW¼ Section 33, Township 23, Range 21, thence east to the beginning, *excepting that part now owned by* [Ozark Power] and subject to flowage deed as per instrument of record.

Empire's petition as "Property 5" and set out as follows:

> [a]ll that part of the SE¼ of the NW¼ situate[d] on the right bank of Roark Creek and that part of the NE¼ of the SW¼ in Section 33, Township 23, Range 21, EXCEPT a tract of land more particularly described as beginning at the NE corner of Park Addition to [Branson], thence North 2 [degrees] 19 [minutes] West to the Southerly bank of Roark Creek; thence in a Southerly direction with the Easterly and Southerly bank of said Roark Creek to the Northerly line of said Park Addition; thence Easterly to the point of beginning; all bearings being referenced to the centerline of Sycamore Street as being due North and South.[8]

Tori, Inc., then executed a "GENERAL WARRANTY DEED" in favor of Mr. Coverdell on September 2, 1999, which recited the legal description in the Hokes quit-claim deed and stated the warranty deed was "subject, to the rise and fall of Lake Taneycomo and the rights of [Empire] in and to the said lands."[9] Mr. and Mrs. Coverdell then conveyed a portion of this property to Coverdell Enterprises on June 12, 2001, with a "QUIT CLAIM DEED."[10]

On November 22, 2004, Branson filed a "Motion for Severance" in which it sought to sever all the issues relating to the western half of the peninsula, which it contended it owned through the conveyance made by the Hokes to the Cordeses. The trial court granted the motion and a bench trial was held "as to the western portion" of the peninsula in November of 2004. Following a bench trial, on December 20, 2004, the trial court entered judgment in favor of Branson ("the 2004 Judgment").[11] The 2004 Judgment determined Branson "is the owner, in fee simple absolute . . . free

---

8. While we do not so hold, as best we can ascertain, this deed appears to convey more to Tori, Inc. than was deeded to the Hokes by the McBrides.

9. There was also a 1993 deed between "Tori, Inc., a defunct Missouri corporation by its statutory trustees, [Mr. and Mrs. Rea]" to "The Branson Paper, Inc., a Missouri corporation." This deed appeared to convey the same property granted to Mr. Coverdell by Tori, Inc. in 1999.

10. This is "Property 6" described in Empire's Petition, to-wit:

> [a] parcel of land situated in the NE4 of the SW4 and the SE4 of the NW4 of Section 33, Township 23 North, Range 21 West, [Branson], as per general warranty deed and being described as follows:
> Commencing at the Northeast corner of Park Addition to [Branson], thence N 02 [degrees] 29 [minutes] 46 [seconds] W along the established property line (as per survey of E.G. Nightengale, Book 13, Page 16) 27.80 feet to a set rebar being the point of beginning, thence continue N 02 [degrees] 29 [minutes] 46 [seconds] W 749.81 feet to a reference point on the top bank of the mouth of Roark Creek, thence continuing N 02 [degrees] 29 [minutes] 46 [seconds] W to the fluctuating waters edge of said Roark Creek, thence easterly and southerly along the fluctuating waters edge of Roark Creek and Lake Taneycomo to a point being S 89 [degrees] 41 [minutes] 34 [seconds] E of the point of beginning, thence N 89 [degrees] 41 [minutes] 34 [seconds] W to a set rebar being a reference point on the bank of said Lake Taneycomo, thence N 89 [degrees] 41 [minutes] 34 [seconds] W 242.06 feet to the point of beginning.

11. We take judicial notice of the proceedings relating to the 2004 Judgment. *See In Interest of C.M.W.*, 813 S.W.2d 331, 333 (Mo.App. 1991) (holding that appellate courts "may take judicial notice of their own records in prior proceedings which are between the same parties and are concerned with the same basic facts involving the same general claims for relief"). We note that Empire, Branson, Mr. and Mrs. Coverdell, and Mr. Rea all appeared either personally or through counsel at this trial in 2004. All other defendants, with the exception of Attorney Griffin, were found to be in default.

and clear of any claims or encumbrances" of the following described property:

[a] tract of land being a part of the Southeast Quarter of the Northwest Quarter and a part of the Northeast Quarter of the Southwest Quarter of Section 33, Township 23 North, Range 21 West, being more particularly described as follows: Beginning at the Northeast corner of Park Addition to [Branson]; thence North 2 [degrees] 19 [minutes] West to the southerly bank of Roark Creek; thence in a southerly direction with the easterly and southerly bank of said Roark Creek to the northerly line of said Park Addition; thence easterly to the Point of Beginning, all bearings being referenced to the centerline of Sycamore Street as being due North and South.

The trial court also determined "no other party has any claim of right, title or interest in or to said property...." As part of the 2004 Judgment, the trial court specifically set out that "upon oral motion of the parties, [the trial court] continues the trial of the remaining issues in the case, dealing with the *eastern* portion of the property alleged in [Empire's] Petition, for setting at a future date ...." (Emphasis added.) The trial court also noted "there is no just cause for delay in entry of this Judgment and Decree, and it is therefore decreed ... final for purposes of appeal." No appeal was taken from the 2004 Judgment. Branson did not remain an active participant in the proceedings leading up to the 2010 Judgment, although it appeared to technically remain a party in the proceedings. Further, Branson did not receive notices and motions made by the parties remaining in the litigation.

Thereafter, on December 31, 2009, Empire "voluntarily dismissed] its Petition ...

without prejudice...." However, as previously mentioned, there yet remained Respondents' previously filed Answer and Counterclaim that was followed by their Second Amended Answer wherein they tersely maintained they had "title in fee simple absolute to the 'disputed' property...."[12] The trial court then determined Respondents' claims survived the voluntary dismissal by Empire and a jury trial was held regarding the quiet title action on January 11, 12, and 13, 2010. Only Empire and Respondents were active participants in this trial.

After hearing evidence and argument, the jury returned a verdict in favor of Respondents. The ensuing 2010 Judgment then ordered, adjudged and decreed that the following property was owned "in fee simple absolute" by Mr. Coverdell:

*[a]ll that part of the SE¼ of the NW½ situate on the right bank of Roark Creek and that part of the NE¼ of the SW¼ in Section 33, Township 23, Range 21, EXCEPT a tract of land more particularly described as beginning at the NE corner of Park Addition to [Branson], thence North 2 [degrees] 19 [minutes] West to the Southerly bank of Roark Creek; thence in a Southerly direction with the Easterly and Southerly bank of said Roark Creek to the Northerly line of said Park Addition; thence easterly to the point of beginning; all bearings being referenced to the centerline of Sycamore Street as being due North and South.*

(Emphasis added.) As best we discern and without so holding, this legal description includes the entirety of the peninsula at issue with a specific exception for that portion awarded to Branson in the 2004 Judgment, and it also appears to include a

---

**12.** However, Respondents never expressly sought to quiet title against Branson or any other party other than Empire.

much larger tract of real property adjacent to the south boundary of the peninsula.[13]

The 2010 Judgment also ordered, adjudged and decreed that the following property was owned "in fee simple absolute" by Coverdell Enterprises:

> [a] parcel of land situated in the NE4 of the SW4 and the SE4 of the NW4 of Section 33, Township 23 North, Range 21 West, ... as per general warranty deed and being described as follows: Commencing at the Northeast corner of Park addition to the [Branson], thence N 02 [degrees] 29 [minutes] 46 [seconds] W along the established property line (as per survey of E.G. Nightengale, Book 13, Page 16) 27.80 feet to a set rebar being the point of beginning, thence continue N 02 [degrees] 29 [minutes] 46 [seconds] W 749.81 feet to a reference point on the top bank of the mouth of Roark Creek, thence continuing N 02 [degrees] 29 [minutes] 46 [seconds] W to the fluctuating waters edge of said Roark Creek, thence easterly and southerly along the fluctuating waters edge of Roark Creek and Lake Taneycomo to a point being S 89 [degrees] 41 [minutes] 34 [seconds] E of the point of beginning, thence N 89 [degrees] 41 [minutes] 34 [seconds] W to a set rebar being a reference point on the bank of said Lake Taneycomo, thence N 89 [degrees] 41 [minutes] 34 [seconds] W 242.06 feet to the point of beginning.

This latter property awarded to Coverdell Enterprises matches the legal description for the property referred to as the eastern portion of the peninsula.[14] Further, the 2010 Judgment decreed that *"no other party* has any claim of right, title, or interest whatsoever in or to the above-described propert[ies]...." (Emphasis added.) Since Branson remained a named party in the litigation the judgment facially appears to also apply to Branson.

The 2010 Judgment led to Branson filing a "MOTION TO APPEAR *AMICUS CURIAE.*" This motion argued that Branson was aggrieved by the 2010 Judgment because although Respondents argued throughout the 2010 trial that Branson "was no longer a party to the suit," the 2010 Judgment, nonetheless, wrongly affected Branson's "rights and interest ..." in the southern tract of land awarded to Mr. Coverdell. Branson further asserted that the legal description in the 2010 Judgment appears

---

**13.** In its "Suggestions Of ... Branson In Support Of The Court Amending Or Modifying The Judgment Filed In The Above–Styled Cause On January 14, 2010," filed "in support of Empire's post-trial motions," Branson presented the affidavit of Curtis Copeland ("Mr.Copeland"), its "Geographic Informations Systems (GIS) Coordinator in the office of City Engineer...." Mr. Copeland, "sworn under oath," stated that "the boundaries of the property described in the Judgment of January 14, 2010[,] ... contains 27.2 acres, more or less. Said description includes a substantial portion of land known as the Branson Landing in which ... Branson claims ownership." Mr. Copeland also averred he had

> reviewed the legal description of the property set forth in the Answer and Counterclaim of [Respondents], in which they claimed title against Empire (but not Branson) that was filed on or about June 10, 2004 ... [and] ... [t]he property depicted ... contains 3.6 acres, more or less, [and] consists of the eastern portion of the [p]eninsula and is completely overlapped by the 27.2 acre tract [as set out in the 2010 Judgment].

**14.** While it appears to this Court that there is an overlap between the property awarded to Mr. Coverdell and that awarded to Coverdell Enterprises, namely they were apparently both awarded the so-called eastern portion of the peninsula, this was not an issue raised by any of the parties and we need not address it here.

to conflict with the legal descriptions in the 2004[J]udgment ... and have caused confusion among some regarding property not at issue in the suit owned by [Branson] and third parties and may constitute a cloud on said title of [Branson] and said third-parties.

Accordingly, it requested to appear *amicus curiae* "to provide the [trial c]ourt suggestions regarding the validity and scope of [the 2010 Judgment]." This motion was denied by the trial court. Branson then filed a Writ of Prohibition and a "REQUEST TO APPEAR AMICUS CURIAE ON APPEAL OR, IN THE ALTERNATIVE, NOTICE OF APPEAL" with this Court. This Court determined Branson was a party to the lawsuit at issue such that it had an independent right to appeal the 2010 Judgment. These appeals by Branson and Empire followed.

We turn first to Branson's assertions of trial court error. In general terms, Branson's four points relied on urge that the trial court plainly erred in entering the 2010 Judgment, because Branson's due process rights were violated by its lack of notice and involvement in the lawsuit following the 2004 Judgment; that the 2010 Judgment exceeded the relief sought by the Respondents in that they asserted no claim against Branson, although the 2010 Judgment divested Branson of its rights in certain property awarded to Mr. Coverdell in the 2010 Judgment; that the 2010 Judgment was not supported by the evidence in that Mr. Coverdell did not have record title to the property awarded to him; and that the finality of the 2010 Judgment was in question due to the fact that it affected the rights of Branson, although Branson's interest in the property was never presented to the jury. In essence, Branson posits error in the fact that, following the 2004 Judgment, it was no longer present in the case as its claim to the western portion of

the peninsula had been settled in the 2004 Judgment, and it had no claim in relation to the eastern portion of the peninsula which was supposedly to be the *sole* issue presented in the second trial. Yet, Branson maintains the 2010 Judgment not only determined the ownership of the eastern portion of the peninsula, it also determined Mr. Coverdell was the title owner to an approximately 27 acre tract of land, the bulk of which was adjacent to the southern boundary of the peninsula. According to Branson, it, as well as numerous other third parties, have interests in that southern tract of land such that Branson was aggrieved by the 2010 Judgment.

We review Branson's allegations of error for plain error relating to its assertions that the 2010 Judgment was not supported by the evidence. In doing so, we are cognizant that Branson was not an active participant at the 2010 trial, made no objections to the presentation of evidence, and did not participate in the jury instruction conference held during the trial. "Rule 84.13(c) states that '[p]lain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom.'" [15] *Wagner v. Mortgage Info. Srvs., Inc.*, 261 S.W.3d 625, 632 (Mo.App. 2008). "In reviewing a claim under the plain-error standard, this Court first asks 'whether there facially appears substantial grounds for believing that the trial court committed error that is evident, obvious and clear, which resulted in manifest injustice or a miscarriage of justice.'" *Id.* (quoting *Cohen v. Express Fin. Srvs., Inc.*, 145 S.W.3d 857, 864 (Mo.App.2004)).

'If in applying this standard the appellate court chooses to exercise its discretion to conduct plain error review, the

---

**15.** All rule references are to Missouri Court Rules (2010).

process involves two steps. First the court must determine whether the trial court actually committed evident, obvious and clear error that affected substantial rights. In the second step of reviewing for plain error, the court must determine whether the evident, obvious, and clear error found resulted in manifest injustice or a miscarriage of justice.' *Id.* at 632–33 (quoting *Cohen,* 145 S.W.3d at 864–65). We recognize that " '[p]lain error review is rarely applied in civil cases, and may not be invoked to cure the mere failure to make proper and timely objections.' " *Roy v. Mo. Pac. R.R. Co.,* 43 S.W.3d 351, 363–64 (Mo.App.2001) (quoting *Guess v. Escobar,* 26 S.W.3d 235, 241 (Mo. App.2000)). Nevertheless, we reverse for plain error in civil cases "in those situations when the injustice . . . of the error is so egregious as to 'weaken the very foundation of the process' and 'seriously undermine confidence in the outcome of the case.' " *Flood ex rel. Oakley v. Holzwarth,* 182 S.W.3d 673, 680 (Mo.App.2005) (quoting *Davolt v. Highland,* 119 S.W.3d 118, 136 (Mo.App.2003)).

Branson contends the issues to be presented to the trial court at the 2010 trial were clearly supposed to have been limited to ownership of the eastern portion of the peninsula and no longer involved Branson's interests. It maintains the trial court in the litigation leading up to the 2004 Judgment set that limitation out by its statement that

> the motion of [Branson] . . . for severance of all issues relating to the [western portion of the peninsula, which they claim,] was presented to the [trial court], and, it appearing to the [trial court] that good cause exists to sever those issues from the remaining issues of the case for trial before the [trial court], said motion is sustained; the [trial court], upon the oral motion of the parties, continues the trial of the remaining issues in the case, dealing with the eastern portion of the

property alleged in [Empire's] Petition, for setting at a future date; the [trial court] notes the request of [Mr.] Coverdell and Coverdell Enterprises for a jury trial, and further notes said request is waived in open court as to the [western portion of the peninsula], however, said request remains under advisement as to the remaining issues in this case, which are to be tried in the future. . . .

■ Further, Branson points out that Respondents' counsel explicitly informed the jury and the trial court during opening statement that "the area we're going to talk about in this case and which my client, [Mr.] Coverdell, and his company, Coverdell Enterprises, owns . . . is this portion of what we call the east side of the peninsula, up here, way north here, okay. We're looking at this way north, not down to the North Beach Park area." He also related that

> [t]here's been a little talk about that, North Beach is down here where the tennis courts are, or were, where the pavilion was, where this path was down here in the park and all that stuff, where they used to play and all that, and the jungle-gym and those sorts of things, the swings. Down here. That's not the particular focus of this case. The particular focus of this case is the dispute up here, up north of that area, this area which is just plain land, for the most part. . . .

Likewise, Respondents' counsel referred "to the land . . . as the eastern half, and it's a little bit more than half, but the eastern portion of the northern part of the peninsula here." Respondents' counsel then set out that with "the other side, the western side, that went from Cordes to a couple of other people, and then eventually . . . Branson bought that. So . . . Branson is the owner and was the owner when it got its deed to the western side of the

peninsula." Respondents' counsel then related that Empire "sued Mr. Coverdell and Empire ... sued ... Branson claiming Empire owned the entire peninsula." He also related that in separate proceedings, "Empire and ... Branson fought over that side over there. And in 2004, a judgment was entered and that judgment was and is in favor of ... Branson [as to the western side of the peninsula]." Saliently, he stated that "[t]here was a final judgment with regard to ... Branson. *[Branson] has nothing to do with this dispute between Empire and [Respondents]*." (Emphasis added.) He opined that he did not know "why somebody's sitting here [in the courtroom on behalf of Branson], but, anyway, they have nothing to do with that. *This dispute is as to the eastern side of the peninsula.*" (Emphasis added.)

It is our view that the foregoing statements by counsel constituted judicial admissions. "A judicial admission is an act done in the course of judicial proceedings that concedes for the purpose of litigation that a certain proposition is true. Judicial admissions are generally conclusive against the party making them." *Moore Automotive Group, Inc. v. Goffstein*, 301 S.W.3d 49, 54 (Mo. banc 2009) (internal citation omitted). " '[A] judicial admission is, in truth, a substitute for evidence, in that it does away with the need for evidence.' " *Allen v. Watson*, 935 S.W.2d 322, 327 (Mo.App.1996) (quoting *Wild v. Cons.Aluminum Corp.*, 752 S.W.2d 335, 338 (Mo.App.1988)). "Determinative, then, of whether [Respondents'] counsel's opening statement constituted a judicial admission is whether he was stating facts or merely outlining what he anticipated the ... evidence would be." *Rawlings v. Young*, 591 S.W.2d 34, 38 (Mo.App.1979). We find that the statements at issue were clearly judicial admissions as the declarations involved statements of fact upon which the jury, the trial court, and the other parties involved in the lawsuit were

entitled to rely. These unequivocal admissions of fact in counsel's statements are judicial admissions and "[a]s such, [the statements are] conclusive on the matter[s] being admitted." *Smith v. Whalen*, 613 S.W.2d 868, 871 (Mo.App.1981), *overruled on other grounds by Thomas v. Siddiqui*, 869 S.W.2d 740, 741 (Mo. banc 1994). Accordingly, Branson facially established that the 2010 Judgment quieting title in Mr. Coverdell in what appears to be a 27 acre tract of land was in error. "A judgment must be based on the evidence presented." *State ex rel. Langiano v. Langiano*, 3 S.W.3d 886, 888 (Mo.App.1999). The error here is clearly "so egregious" that it " 'weaken[s] the very foundation of the process' and 'seriously undermine[s] confidence in the outcome of th[is] case.' " *Flood*, 182 S.W.3d at 680 (quoting *Davolt*, 119 S.W.3d at 136). In this respect, the trial court committed evident, obvious and clear error by entry of its judgment that affected substantial rights of Branson as party to the litigation which resulted in manifest injustice or a miscarriage of justice. *See Dana Comm'l Credit Corp. v. Cukjati*, 880 S.W.2d 612, 617 (Mo.App. 1994) (holding that plain error review is appropriate to correct trial court errors in entering judgment against a defendant where the plaintiff's petition does not pray for relief against a particular defendant); *see also Meredith Dev. Co. v. Bennett*, 444 S.W.2d 519, 524 (Mo.App.1969).

Additionally, while Branson presented evidence in certain post-judgment proceedings showing that the 2010 Judgment had an adverse impact on its real property holdings and possibly those of third parties, the matter has not been conclusively proven in a court of law. Furthermore, we are cognizant that in quiet title actions "where each party is claiming title against the other party, the burden of proof is upon each party to prove better

title than that of his adversary. The claimant must rely upon the strength of his own title and not upon the weaknesses in the title of his opponent." *Shuffit v. Wade,* 13 S.W.3d 329, 332–33 (Mo.App. 2000). It is impossible to determine the effect Branson's lack of active involvement in the litigation may have had on Empire and the way it tried its case. Furthermore, as to Respondents, " '[i]f a plaintiff, by mistake or inadvertence, fails to produce sufficient evidence at trial to prove his claim, in a situation where the proof seems to be available, the case should be remanded to permit the introduction of additional evidence.' " *Brattin Ins. v. Triple S. Props.,* 77 S.W.3d 687, 689 (Mo.App. 2002) (quoting *In re Estate of Mapes,* 738 S.W.2d 853, 856 (Mo. banc 1987)). Given the particular and unusual circumstances of this case, justice and the requirement of a fair trial for all parties require the reversal of the entirety of the judgment and remand of the cause to the trial court for further proceedings.[16] *See Pitts v. Pitts,* 388 S.W.2d 337, 341 (Mo.1965) (holding that where a cause must be remanded "the interests of justice will best be served by permitting [the] plaintiff and [the] defendants to present to the court the matters upon which their respective claims are based in order that the court may be fully informed before determining their respective rights"); *see also Stottle v. Brittian,* 459 S.W.2d 310, 313 (Mo.1970). In this respect, the trial court shall permit Branson to amend its pleadings and to freely permit the amendment of pleadings of both Empire and Respondents should they choose to do so without prejudice to the rights of third parties to intervene in the litigation as the rules of civil procedure may provide.[17] Costs on appeal are assessed one-third each against Branson, Empire and Respondents.

---

**16.** Accordingly, the points of error posited by Empire in this appeal are now moot and need not be addressed.

**17.** Branson's motion to strike Exhibit 25A tendered by Respondents is also moot.