Ben PIERSON and Tracy Pierson, husband and wife, Respondents,

v.

Todd KIRKPATRICK, d/b/a A–1 Home Inspection, Appellant.

No. SD 31157.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 26, 2012.

Craig F. Lowther, Lowther Johnson, LLC, Springfield, for appellant.

Stuart H. King, Hosmer, King & Royce, PC, Springfield, for respondents.

ROBERT S. BARNEY, Judge.

Todd Kirkpatrick, d/b/a A–1 Home Inspection ("Appellant"), appeals from the trial court's judgment granting Ben Pierson ("Mr. Pierson") and Tracy Pierson (collectively "Respondents") $5,875.00 on their "PETITION FOR DAMAGES" relating to an inspection performed by Appellant on a home ultimately purchased by Respondents.[1] Appellant asserts five points relied on. We affirm the judgment of the trial court.

Viewing the evidence in the light most favorable to the trial court's judgment, *GMAC v. Crawford*, 58 S.W.3d 529, 532 (Mo.App.2001), the record reveals that in the spring of 2005 Respondents and the Walkers entered into a residential home sales contract whereby Respondents agreed to purchase and the Walkers agreed to sell a residential home located in Springfield, Missouri. As part of that transaction, Respondents hired Appellant to perform a home inspection in exchange for $265.00, and Appellant's agent, Tommy Crain ("Mr. Crain"), performed the home inspection on or about March 20, 2005. Mr. Crain prepared and presented an inspection report to Respondents. As best we discern, Respondents relied on this report in making their decision to purchase the home. It was not until after the transaction was closed that fire-related roof and attic issues were discovered with the house during a remodeling project by Respondents.

On October 31, 2006, Respondents filed suit against Appellant alleging one count of negligence for Appellant's failure to "properly access and inspect the attic of the residence to the extent necessary to see the extensive amount of charred support structure and other fire damage to the attic;" to "properly access and inspect the attic of the residence to the extent necessary to see the defective and unprofessional attempts to 'patch' areas of the roof;" and to alert Respondent to the damage and potential cost of repair. Respondents also brought a second count against Appellant for breach of contract in that the contract with Appellant included an agree-

---

1. Jack and Pamela Walker ("the Walkers") were the sellers of the home at the center of this lawsuit. They settled with Respondents prior to trial for the amount of $8,000.00. The Walkers do not appear in this appeal. Accordingly, the claims and evidence against them will not be discussed herein.

ment that Appellant would "perform the inspection in a good and workmanlike matter and ... use ... reasonable and ordinary care ..." in inspecting the property and Appellant breached that agreement by failing to find the fire damage in the attic. Respondents also brought a third count against Appellant for breach of a settlement agreement. In this count Respondents alleged that after demanding Appellant repair the roof damage missed in the inspection, the parties entered into an agreement "that [Respondents] would obtain a report of the defects to the roof and/or attic ... and [Appellant] would retain one or more companies with the necessary expertise to make the necessary repairs ... and pay said company(ies) to make said repairs...." According to Respondents, Appellant then breached that agreement by refusing to find experts to make the repairs and refusing to communicate with them.

While denying the majority of the claims set out in Respondents' petition, Appellant asserted several "AFFIRMATIVE DEFENSES" in his Answer to Respondents' claims. First, Appellant pled that Respondents had "already settled and been paid by [the Walkers]" such that "[a]ny and all sums should be directly credited against any judgment rendered against [Appellant] and reduce the amount of any judgment that might be entered...." He further averred that Respondents "are contributorily negligent by failing to see defects in the house, have waived any right to recover due to the delay on their part and should be estopped from proceeding against [Appellant] after they have fully settled this lawsuit and collected ... 100 [percent] of their damages from the [Walkers]."

A trial on this matter was held on November 18, 2010. At trial, Mr. Pierson testified he entered into a contract with Appellant to perform the home inspection and that the report provided after the inspection indicated the attic was "serviceable." He also testified he did not sign a written contract with Appellant. When fire damage was later discovered in the attic area, he contacted Appellant and Appellant re-inspected the attic area. Mr. Pierson testified there was damage to "[e]verything" in the attic including "the ceiling joists, the roof joists, the decking." In his discussions with Appellant after the discovery of the damage, he related Appellant told him that he "was going to have his workers inspect the house and do the demolition and the framing and that he was going to have somebody come and roof it." This solution was not acceptable to Mr. Pierson who wanted a licensed contractor to make these structural repairs to his newly purchased home. He related that he did not feel that allowing "the guy that inspected [his] house" to perform structural repairs to the joists and beams was the appropriate resolution. Mr. Pierson related that he felt the damage caused a dangerous condition in his home and affected his ability to potentially sell it in the future. He admitted he had taken no steps to fix the problems himself, but that while he was "worried about it ... [he believed] it will hold till [it] can get ... repaired." He stated he did receive $8,000.00 from the Walkers and intended on fixing the problems once "the entire case" was resolved.

Jeremiah Lee ("Mr. Lee"), an estimator for Rock Solid Construction, testified that he looked at the damage to Respondents' home and prepared a proposal for them. He related that he proposed a "two to three-week project" that included "removing the gable roof over their living room area and reframing that;" taking off the roof decking "and shingles and rafters;" "replac[ing] the ceiling joists;" and removing the ceiling to access the joists and then

replacing that drywall. He related the price of his bid was $15,159.00. A copy of his proposal was introduced into evidence. Mr. Lee testified that he believed the best course of action was to completely replace the ceiling joists as opposed to attaching "sister" joists to the charred joists already in place. He related that to be "done right" all of the fire damaged materials in that area of Respondents' roof should be replaced and his suggested solutions were not cosmetic in nature. He related he bids his jobs based on how he would repair his own home.

In the presentation of his evidence, Appellant testified that the inspection report prepared by Mr. Crain was a standard form utilized by his company for a number of years. He stated that when he re-inspected the home at Respondents' request, he discovered Mr. Crain's report was "[n]ot totally" correct; that Mr. Crain had missed an area of "some fire damage" in a portion of the attic; and that there was "some" "deterioration of the joists" in that area. He stated that after re-inspection, he offered to "go ahead and fix it for them." He related that he had no obligation to do so, but he called to give his opinion of the cost to repair the fire damage to Respondents' attic. He related that he and an area roofer, Kenny Teague ("Mr. Teague"), got on the roof, observed that it appeared to be structurally "strong," and discussed the options to re-

pair it. Appellant testified that he could do the necessary framing involving the rafters and ceiling joists himself although he had never truly seen the extent of the damage. He opined that his plan was "to sister the ceiling joists right next to the old ones without tearing out the ceiling." He stated Mr. Teague believed he could "tear off the [roof] deck and put new decking" for around $3,300.00. Appellant also stated no repairs were ever completed as he was instructed by Respondents to deal with their legal counsel in proceeding with the repairs and Appellant reported there were difficulties with that as counsel "wanted a licensed framer" to do the repairs. Appellant testified there is no such thing as a "licensed framer" in this State and that he and Mr. Teague had ample expertise to make these repairs themselves.

On the issue of a purported contract between the parties, Appellant testified Respondents "tried to put in about half of [the] contract earlier" with the introduction of their Exhibit 7. He related the first page of the purported contract clearly says "[c]ontract continues on the back side of this page" and Respondents did not include the second page of the document containing a limitation on liability and providing that an unhappy homeowner was limited solely to the return of the $265.00 paid for the home inspection.[2] Appellant

---

2. The second page of this document read in pertinent part:

**LIMITATION ON LIABILITY**
**INSPECTOR'S LIABILITY FOR MISTAKES OR OMISSIONS IN THIS INSPECTION REPORT IS LIMITED TO A REFUND OF THE FEE PAID FOR THIS INSPECTION REPORT.** THE LIABILITY OF INSPECTOR'S PRINCIPALS, AGENTS, AND EMPLOYEES IS ALSO LIMITED TO THE FEE PAID. THIS LIMITATION APPLIES TO ANYONE WHO IS DAMAGED OR HAS TO PAY EXPENSES OF ANY KIND BECAUSE OF MISTAKES OR OMISSIONS IN THIS INSPECTION AND REPORT. THIS LIABILITY LIMITATION IS BINDING ON CLIENT AND CLIENT'S SPOUSES, HEIRS, PRINCIPALS, ASSIGNS AND ANYONE ELSE WHO MAY OTHERWISE CLAIM THROUGH CLIENT. CLIENT ASSUMES THE RISK OF ALL LOSSES GREATER THAN THE FEE PAID FOR THE INSPECTION. CLIENT AGREES TO IMMEDIATELY ACCEPT A REFUND OF THE FEE AS FULL SETTLEMENT OF ANY AND ALL CLAIMS WHICH

acknowledged that he could not locate a copy of a completed, written contract between himself and Respondents and admitted he was not sure if Respondents had ever signed a contract with him. He also acknowledged his Exhibit 3 was a copy of both sides of the contract he had used for approximately ten years. He related that this contract document was attached to every inspection report he prepared and was "part of the report." He related there was also "an option to pay typically three times the fee to remove that limitation." He related Respondents paid the amount of $265.00 such that they were limited in their recovery from him to that amount.

Mr. Teague testified that he inspected the damage to Respondents' roof along with Appellant. Mr. Teague stated there were no outward signs of roof damage and it appeared to him to be structurally sound. He admitted he had never been in the attic of Respondents' home and relied only on photographs in making his bid to repair the area in the attic beneath the roof. He related that although there was damage to the rafters, he opined that sister joists were not necessary in that the damaged rafters were made of oak and remained strong despite the charring. He felt that replacing the rafters would be a purely cosmetic decision. He related that he intended on having Appellant help him "put the framing in" and believed the project would take two days. He related that he thought he could repair damaged "rafters, decking, and shingles" for $3,300.00 and a copy of his proposal was introduced into evidence.

At the close of all the evidence the trial court took the matter under advisement. On February 18, 2011, the trial court issued its "JUDGMENT" in which it found "in favor of [Respondents] and against

[Appellant] on the claim set forth in [Respondents'] Petition in the principal amount of $5,700.00. Said sum takes into account and applies all fees and setoffs found applicable by the [trial c]ourt." The trial court also assessed costs in the amount of $175.00 against Appellant. This appeal followed.

In this court-tried case, our review is governed by Rule 84.13(d).[3] We must affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976); *Ridgway v. TTnT Dev. Corp.,* 126 S.W.3d 807, 812 (Mo.App.2004). A judgment is presumed correct, and the appellant has the burden of proving it is erroneous. *Grider v. Tingle,* 325 S.W.3d 437, 440 (Mo.App.2010). We review the evidence and all reasonable inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences. *Arndt v. Beardsley,* 102 S.W.3d 572, 574 (Mo.App.2003). Credibility of the witnesses and the weight to be given to their testimony is for the trial court, which is free to believe none, part, or all of the testimony of any witness. *Credit Bureau Sys., Inc. v. Carter,* 334 S.W.3d 152, 155 (Mo.App.2011). We defer to the trial court's superior opportunity to assess the witnesses' credibility. *Id.* No such deference is afforded the trial court, however, when we review its conclusions of law. We independently evaluate whether the trial court properly declared or applied the law to the facts presented. *Schubert v. Trailmobile Trailer, L.L.C.,* 111 S.W.3d 897, 899 (Mo.App.2003).

█ For ease of analysis, we have chosen to address Appellant's points relied on

---

MAY EVER ARISE FROM THIS INSPECTION.

3. All rule references are to Missouri Court Rules (2011).

out of order. Appellant's second, third, fourth, and fifth points relied on can be summarized as follows: the trial court's judgment in favor of Respondents was not supported by substantial evidence, was against the weight of the evidence, and erroneously applied the law in that the trial court "ignored a clause in the inspection contract between Appellant and Respondents, which limited Appellant's contractual liability to the inspection fee paid by Respondents;" the trial court "ignored a clause in the inspection contract between Appellant and Respondents, which limited Appellant's liability for negligence to the inspection fee paid by Respondents;" the trial court "ignored Respondents' intentional withholding/spoliation of evidence at trial, specifically the portion of the inspection contract entered into between Appellant and Respondents that limited Appellant's liability for breach of contract and for negligence;" and there was no evidence "presented concerning the diminution in the fair market value of Respondents' property, thereby preventing judgment on the claim of negligence in Respondents' Petition." The problem with the aforementioned issues as framed in Appellant's points relied on is that they are irrelevant based on statements made at trial by Appellant's counsel.

Here, in opening statement, counsel for Respondents stated:

I really think there's just a couple of issues here, Judge.... One, what needs to be done to fix this problem? I don't think there's going to be a significant issue before the Court . . . as to whether this inspection was properly done, it wasn't. The question is going to be, what needs to be done to fix the fire damage in the attic and what's that going to cost?

And then I think there's a separate legal question as to what amount, if any, of the prior settlement [Appellant is] entitled to [as] a credit for which is a legal issue and factual issue that I'm sure we'll get into in [Appellant's] portion of the case.

Counsel for Appellant then stated as part of his opening statement:

[Respondents have] been paid $8,000, it cost [$]3300 to fix it. My guy looked at it and said, 'Yeah, we missed it. Sorry. I'll fix it.' Still willing to fix it. It takes $3300 to take off the shingles, take off the felt, take off the roof decking, rafters, and ceiling joists and replace them all and make it brand—not like new, but brand new, and it's $3300.

[Mr. Teague is] going to be here and he's been doing that stuff for years and years and years, done hundreds. I don't know whether he's going to say thousands. It cost $3300, a one-day job. [Respondents want] fifteen grand to do it, [they have been] paid eight, and [they have been] paid double what it would cost to replace this thing and make it brand new. But, yeah, we missed it. Question is, what's it cost to fix it?

They want something for $15,000 to do it and that's crazy, you know. That's it.

After a discussion about various exhibits, the following then occurred:

THE COURT: I do view as what was said in opening as a judicial admission before you decide what all you have to put on for me today.

COUNSEL FOR APPELLANT: Sure. Hey [counsel for Respondents]—

COUNSEL FOR RESPONDENTS: Yes.

COUNSEL FOR APPELLANT:—we'll agree that it's their house, they had a contract, they settled it, they bought it.

Later, during the testimony of Appellant, Appellant himself admitted that the reasonable cost of repair was the sole issue

for determination at trial. During direct examination by counsel for Respondents the followed transpired:

COUNSEL FOR RESPONDENTS: You suspected ... the area of the attic must have been overlooked and possibly not inspected. Do you still believe that today?

APPELLANT: Well, obviously.

COUNSEL FOR RESPONDENTS: Okay. Is it fair to—is it fair to say then that there's not a dispute to this Court with respect to [your] obligation to pay for the reasonable cost of the repairs of this damage? Do you agree with that?

APPELLANT: I agree.

Appellant, therefore, admitted it was his obligation to "pay for the reasonable cost of the repairs of this damage."

■ While Respondent argues the aforementioned statements constituted judicial admissions which would be conclusive upon the party making them, *see The Empire Dist. Elec. Co. v. Coverdell*, 344 S.W.3d 842, 852 (Mo.App.2011), a more accurate description of what transpired is that in its opening remarks Appellant engaged in invited error. Appellant's counsel initially conceded that his inspection was improperly performed. Appellant's counsel then specifically limited the facts and law in issue at trial to a determination of the cost "to fix the fire damage in [Respondents'] attic." However, Appellant then complains on appeal that the trial court did not explore the notion of the contractual liability of the parties, the terms of a potential contract between the parties, issues relating to spoliation, and evidentiary concerns relating to the diminution in the fair market value of Respondent's home. "The general rule of law is that a party may not invite error and then complain on appeal that the error invited was in fact made.'" *Lau v. Pugh*, 299 S.W.3d 740, 757 (Mo.App.2009) (quoting

*Rosencrans v. Rosencrans*, 87 S.W.3d 429, 432 (Mo.App.2002)). "It is axiomatic that a 'party cannot lead a trial court into error and then' lodge a complaint about the action." *In re Berg*, 342 S.W.3d 374, 384 (Mo.App.2011) (quoting *Schluemer v. Elrod*, 916 S.W.2d 371, 378 (Mo.App.1996)). The trial court was entitled to rely on the statements by Appellant's counsel and to isolate the issues before it in accordance with those statements. Appellant cannot now complain that the trial court failed to consider certain issues when it clearly isolated the issues before the trial court in its opening statement. Accordingly, save for Appellant's first point relied on, Appellant's remaining points have been rendered irrelevant. Appellant's Points II, III, IV and V are denied.

■ Turning to Appellant's first point relied on, Appellant therein argues the trial court's judgment in favor of Respondents was not supported by substantial evidence, was against the weight of the evidence, and erroneously applied the law in that "the evidence overwhelmingly demonstrates Appellant was ready, willing, and able to perform his settlement agreement with Respondents, but Respondents refused and prevented Appellant's performance . . . ."

■ We find no merit in Appellant's first point. "In Missouri, the general rules of contract construction apply when interpreting settlement agreements." *Park Lane Med. Ctr. of Kansas City, Inc. v. Blue Cross/Blue Shield of Kansas City, et al.*, 809 S.W.2d 721, 724 (Mo.App.1991). "A legal, valid settlement agreement must possess all the essential elements of any other contract." *Tirmenstein v. Central States Basement and Foundation Repair, Inc.*, 148 S.W.3d 849, 851 (Mo.App.2004). "The essential elements of a contract are: (1) competency of the parties to contract;

(2) proper subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation." *Arndt v. Beardsley,* 102 S.W.3d 572, 575 (Mo.App. 2003). "The term 'mutuality of agreement' implies a mutuality of assent by the parties to the terms of the contract, i.e., a meeting of the minds." *Id.* Based on the record we cannot conclude there was a firm settlement agreement, or a meeting of the minds, among the parties particularly as to what structural changes Appellant was to make to the residence. Furthermore, at trial Appellant made no claim of a prior breach of a settlement agreement nor did he file a counterclaim making this assertion. As Respondents point out in their brief, there was no argument at trial that they breached a settlement agreement nor was such an argument made in either of Appellant's post-trial motions. " '[A] party cannot request relief on appeal not sought in the trial court.' " *Sapp v. Morrison Brothers Co.,* 295 S.W.3d 470, 484 (Mo. App.2009) (quoting *Bunting v. McDonnell Aircraft Corp.,* 522 S.W.2d 161, 168 (Mo. banc 1975)). Point I is denied.[4]

The judgment of the trial court is affirmed.

SCOTT, and FRANCIS, JJ., concurs.

---

4. All motions filed in this case are also de-    nied.