Angela GRANT, Appellant,

v.

James SEARS, Respondent.

No. WD 74864.

Missouri Court of Appeals, Western District.

Sept. 25, 2012.

Robert W. Russell, Sedalia, MO, for appellant.

J. Christopher Spangler, Sedalia, MO, for respondent.

Before Division Three: VICTOR C. HOWARD, Presiding Judge, KAREN KING MITCHELL, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

Angela Grant ("Grant") appeals from the trial court's judgment granting James Sears's ("Sears") motion to enforce settlement. On appeal, Grant contends that the trial court erred in enforcing the settlement agreement because there was no meeting of the minds between Grant and American Family as to the material terms of settlement, and alternatively, if an enforceable settlement agreement was formed, American Family breached the agreement. We reverse and remand the trial court's judgment.

### Factual and Procedural History

The material facts are not in dispute. On March 31, 2009, Grant filed a petition for damages ("Petition") against Sears for injuries Grant sustained as a result of a March 3, 2009 motor vehicle accident. At the time of the accident, Sears was driving a rental car, but had liability insurance coverage with policy limits of $25,000.00 from an American Family Mutual Insurance Company ("American Family") policy belonging to Sears's mother, Carla Burel.

On May 8, 2009, First Recovery Group LLC ("First Recovery Group") notified Grant's attorney, Robert W. Russell ("Russell"), that Mercy CarePlus [1] was asserting a lien for medical expenses paid on Grant's behalf in the amount of $31,969.50.

On October 6, 2009, First Recovery Group notified American Family that the Medicaid Plan, Mercy CarePlus, had paid medical benefits on Grant's behalf in the amount of $36,361.87.

On October 28, 2009, First Recovery Group advised Russell that Mercy CarePlus's claim amount was now $36,361.87, acknowledged receipt of correspondence from Russell, and communicated an intent to seek the consent of Mercy CarePlus to agree to split the $25,000.00 American Family policy limits equally between Grant, Russell, and Mercy CarePlus.

On December 2, 2009, Russell sent American Family a letter demanding payment of the $25,000.00 policy limits and alleging that Grant had suffered permanent injuries as a result of Sears's negligence in excess of $58,500.00 ("Demand Letter"). The letter also requested an affidavit from the insured [2] that no other coverage existed for the accident.

On December 21, 2009, American Family responded to the Demand Letter as follows:

> We have received your demand for settlement of the above referenced client. ***Your offer to settle for our $25,000.00 policy limits is accepted.***
>
> If you need an affidavit of no other coverage from our policy holder, please provide the form and it will be sent to her for her signature. She has no telephone.

(Emphasis added.) The letter then continued:

> We are on notice of liens from Medicaid and First Recovery Group. Please provide their final lien letters.
>
> Please verify whether or not your client is a Medicare recipient.

---

1. Mercy CarePlus, a Medicaid plan, retained the services of First Recovery Group to represent Mercy CarePlus in connection with their rights of subrogation and/or recovery regarding medical claims paid on behalf of Grant.

2. The insured was Carla Burel, Sears's mother.

*In the meantime, our release is enclosed.*

(Emphasis added.)

On January 7, 2010, Russell responded: "On behalf of my client, Angela Grant, we hereby accept the policy limits of $25,000.00. Please forward the settlement check to me at your earliest opportunity." Russell's letter did not mention American Family's request for information pertaining to Medicare, the Medicaid lien, or the general form of release.

On January 11, 2010, a secretary in Russell's firm sent American Family a letter enclosing the release. Before signing the release, Grant crossed out language purporting to release "all other persons and organizations who are or might be liable." The letter enclosing the release again requested issuance of the settlement check, and asked that it be made payable to Grant and Russell's law firm.

On February 22, 2010, American Family wrote to Russell as follows:

FEDERAL LAW (See 42 U.S.C. 1395y(b)(7) and (8)) was recently changed and now requires us to report to the Center for Medicare and Medicaid Services all payments and settlements to people who are on Medicare or who may become eligible for Medicare. In order to comply with the Federal Law, we are required to collect the following information regarding your client. Please respond in writing as to whether or not your client is a Medicare recipient or may become eligible for Medicare along with your client's full name, current address, date of birth and your client's social security number or HICN number.

I am following up on my telephone message left for you on January 15, 2010. Please forward your *proposed release* for review by our legal department.

Please forward the final lien amounts.

(Emphasis added.)

On March 4, 2010, First Recovery Group notified Russell that Mercy CarePlus had agreed to settle its claim for the sum of $8,333.33, one-third of the policy limits.

On March 10, 2010, Russell responded to American Family's February 22, 2010 letter as follows:

In negotiating the release and documents to settle this claim, there was no discussion as to the requirements American Family has under Federal Law. Further, it is not [Grant's] duty to make such a reporting. We will of course honor all liens filed by Medicaid or Medicare in this case. In fact, we are dealing with them to resolve that. It has been almost two months since you have received the release and we have not seen the check. Please be advised if the check is not sent to our office in the next 10 days, we will consider American Family and Ms. Burel in breach of the release and pursue all legal options available to Ms. Grant up to and including seeking a section 537.065 RSMo. [a]greement from Ms. Burel and her son for the true amount of damages suffered by Ms. Grant in this case.

As I said in my previously [sic] letter the check should be made payable to Angela Grant and our firm.

On March 15, 2010, American Family advised Russell that its legal department *had accepted the release* in the modified form signed by Grant and imposed the following options for payment of the policy limits: (1) the settlement check would be issued to Grant, Russell's law firm and all lien holders who had placed American Family on notice; or (2) Russell would "agree in writing to comply with Advisory Committee Formal Opinion 125 (copy enclosed), and provide the Medicare information that will satisfy the federal reporting

requirement under 42 U.S.C. 1395y(b)(7) and (8)," whereupon the settlement check would be issued payable to Grant and Russell's firm.

On March 19, 2010, Russell wrote to American Family and advised that Medicare[3] was the only lien holder known to Grant and that an arrangement had been worked out to address the Medicare lien. Russell's letter also stated, "I realize I am bound by the ethical rules of the State of Missouri, and I will conform and follow those rules. On that subject I will say nothing more. I again reiterate demand for the check to resolve Ms. Grant's claim."

On March 26, 2010, American Family wrote to Russell:

> We have received your **demand for the settlement** of the above referenced client.
>
> Enclosed is a copy of the lien we have on file. I am ready to issue payment of our policy limits. As discussed with our legal department, the lienholders(s) have to be named on the payment unless you provide the amount(s) for separate checks or lien waiver(s). Since you have indicated that Ms. Grant is a Medicare recipient, I will also need her Medicare number for the required reporting
>
> At this time, we are aware of the lien(s) listed below: FRG [in the amount of] $44,827.09.

(Emphasis added.)

On May 4, 2010 and again on July 1, 2010, American Family notified Russell that it had received word from First Recovery Group about the agreement to accept $8,333.00 in satisfaction of the Mercy CarePlus Medicaid (not Medicare) lien. American Family asked Russell to provide final lien amounts and to advise whether Grant is a Medicare recipient.

On July 23, 2010, Russell responded as follows:

> Based upon the conduct of American Family and seeing that we are eight months from the date that my client was owed money to the settlement agreement [sic].
>
> We now consider the settlement agreement to be void based upon American Family's conduct.
>
> At this time, we are proceeding with the service against Mr[.] Sears and will proceed against him for a verdict which I believe will be well in excess of American Family's policy limits in this case. Additionally, based upon Mr. Sears'[s] pleas of guilty to the felony charges that arose out of this crash, I feel confident that liability is not an issue and we are discussing solely the significant injuries and trauma my client has suffered as a result of Mr. Sears'[s] conduct.

On August 3, 2010, Sears was served with the Petition that had been filed on March 31, 2009.

On August 5, 2010, American Family responded to Russell's July 23, 2010 letter as follows:

> Frankly, I am mortified to read such an inaccurate account of your beliefs in this matter. It is an obvious attempt to stage a scenario of blame for a less than ideal settlement situation (low policy limits). The only real delay in concluding Angela Grant's claim with us is your own appalling conduct and stubborn refusal to provide the lien information. During the course of this claim, you indicated that Angela Grant is a Medicare recipient. I learned from First

---

**3.** This was a misstatement. The Mercy CarePlus lien was a Medicaid lien, not a Medicare lien.

Recovery Group that she is also a Medicaid recipient. American Family received the release in this matter on January 14, 2010. Since that time, I have been requesting the lien information from you (as Super Liens are involved). On March 26, 2010, I called First Recovery Group myself and was told that they did negotiate their lien with you, reducing it to $8333.00. Their representative referred me to you for a copy of the documentation. My file reflects that I have sent six letters to you between January 14, 2010 and July 1, 2010, all in a good faith attempt to finalize this claim for Ms. Grant.

As of the date of this letter, I am still waiting on Medicaid and Medicare final lien information to issue payment of our policy limits, indicating it is your conduct (not the conduct of American Family) that is causing any delay.

A month later, on September 6, 2010, American Family sent Russell another letter stating that, "An *offer* was previously made to conclude this matter. I am waiting on the final lien information to issue payment." (Emphasis added.)

On September 8, 2010, Russell sent a letter to American Family stating:

I received your letter of August 5, 2010. Your letter is extremely inaccurate and more mortifying than the ten months that American Family has held onto the monies it promised to pay Ms. Grant. Please be advised that on August 3, 2010, Mr. Sears was served with process and summons to file an answer in this case. I have enclosed a copy of the petition for you.

I understand Mr. Sears is now currently serving a five year term in the Department of Corrections so he may not have had the opportunity to forward this document along to you. Certainly, we are looking to make sure that Mr. Sears has had ample time to file an answer before we seek a default judgment. Such default judgment will be for the entirety of the damages suffered by Ms. Grant as clearly you are in breach of the settlement agreement. It shocks me that American Family would care more for its own self interests than that of its insured's.

To correct the inaccuracies in your letter I enclose the document from First Recovery that has the only lien in this case. As you can see the matter has been resolved and has been resolved for quite some time awaiting payment from American Family.

Due to American Family's foot dragging and failure to pay monies due under the settlement agreement, American Family is in breach and no consideration has been received to complete any settlement agreement. As a result of American Family's failure to hold up its end of the agreement, Ms[.] Grant is [sic] a full and fair judgment for the losses she suffered at the hands of your insured.

Discovery proceeded in the litigation. On December 2, 2011, Grant answered interrogatories confirming she was not a Medicare beneficiary.

On December 16, 2011, Sears's filed a motion to enforce settlement agreement ("Motion"). A hearing was conducted on the Motion on January 17, 2012, at which time the settlement negotiation correspondence was admitted into evidence by the stipulation of the parties.

Sears argued that American Family's December 21, 2009 letter responding to the Demand Letter was a counteroffer. Sears argued that the letter acknowledged American Family's agreement to pay the $25,000.00 policy limits "but also put some additional terms in" which conditioned the willingness to pay the policy limits. Those additional terms, according to Sears, were (i) final lien letters from Medicaid, and (ii)

verification of whether Grant was a Medicare recipient. Sears argued that Russell's January 7, 2010 letter was an acceptance of American Family's counteroffer because even though it "ignore[s] the issue about Medicaid, and ... ignore[d] the issue about Medicare," it said "we accept $25,000.00."

Grant argued that the December 21, 2009 letter was not a counteroffer because although it requested additional information, it also unequivocally accepted the terms of the Demand Letter without condition. Grant points to the form of release sent by American Family along with the letter, and to the fact the release made no reference to delivery of lien information as a required material term of settlement. Grant also argues that even if the December 21, 2009 letter could be construed as a counteroffer, the January 7, 2010 letter did not accept American Family's additional terms addressing the liens, and that there was never a meeting of the minds on those terms.

Sears responded that Russell's January 7, 2010 letter had to be an acceptance because "[Russell] had an obligation to make another counter" or to accept the December 21, 2009 counteroffer.

On February 1, 2012, the trial court sustained Sears's Motion. In its judgment ("Judgment"), the trial court found that the Demand Letter made a demand for the policy limits, that American Family's December 21, 2009 response was a counteroffer to settle the claim for policy limits subject to the provision of lien information, and that Russell's January 7, 2010 letter accepted American Family's counteroffer. The trial court reasoned that:

> [B]ecause [American Family's] letter of December 21, 2009, is an acceptance of [Russell's] offer with conditions, it must be construed as a counteroffer [and] [ ] Russell's letter of January 7, 2010, is a simple two sentence acceptance of that counteroffer. The letter did not reference any other requests or make any counteroffers. If [ ] Russell was not accepting the counteroffer thus made by [American Family], the logical question is, what was the acceptance of January 7, 2010, referencing? The counteroffer was conditioned upon [Grant] providing the necessary Medicaid and Medicare information. The consideration for the contract was a promise to pay in exchange for a release from litigation and further liability.
>
> There is nothing in the record before the Court that leads it to any conclusion other than a contract to settle for $25,000 with the liens being satisfied was agreed to and equitably should be enforced. The Court finds by clear and convincing evidence that there was a meeting of the minds when [American Family] expressed [its] requirements to settle in the letter of December 21, 2009, and [Grant] accepted in the letter of January 7, 2010.

Accordingly, the trial court found the release in the form signed by Grant to be "valid and enforceable." It directed American Family to "complete the execution of the settlement agreement and tender a sum in the amount of $25,000 payable to [Grant], [Russell's law firm], and First Recovery Group," after which the trial court would dismiss the case with prejudice.

Grant appeals.

## Standard of Review

The Judgment states, "The parties agree that it is appropriate to use the procedural method of judgment on the pleadings instead of an additional evidentiary hearing or summary judgment motion" to dispose of the Motion. We do not agree. We note that on appeal, notwithstanding the language in the Judgment,

both parties assert, without citation to authority, that the Judgment should be treated as an award of summary judgment as matters outside the pleadings were considered by the trial court. We must independently assess the procedural category into which the Judgment falls before we can articulate the proper standard of review.

■■■ "When a motion to enforce a settlement agreement is filed, the circuit court 'may take one of three possible avenues to decide' such motion." *Paragon Lawns, Inc. v. Barefoot, Inc.*, 304 S.W.3d 298, 300 (Mo.App. W.D.2010) (quoting *Eaton v. Mallinckrodt, Inc.*, 224 S.W.3d 596, 599 (Mo. banc 2007)). "These three avenues are: (1) the court may hold an evidentiary hearing 'to determine the disputed facts and then enter judgment after taking evidence to prove the agreement and any defenses the non-moving party may proffer'; (2) 'the court may dispose of the motion on the pleadings pursuant to Rule 55.27'; or (3) the court may dispose of the motion by summary judgment pursuant to Rule 74.04." *Id.* (quoting *Eaton*, 224 S.W.3d at 599). "By far the most desirable approach would be to hold an evidentiary hearing where the moving party proves the agreement and the non-moving party can then present evidence as to any defenses." *Eaton*, 224 S.W.3d at 599.

At the hearing, the trial court expressly observed that the Motion was not a summary judgment motion as it failed to comply with Rule 74.04. The trial court then indicated its inclination to treat the Motion as a judgment on the pleadings. In response, Sears suggested that an evidentiary hearing would be appropriate, or that the parties could treat the Motion and Grant's response, along with the exhibits attached to the pleadings, as the "pleadings" on which a judgment could be entered.

Grant agreed with the trial court that the Motion was not a summary judgment motion, and further observed that he did not think the hearing was intended as an evidentiary hearing. Grant expressed the view that, "I think you're back to a motion for judgment on the pleadings, which, then, of course, has brought in information beyond the pleadings which is attempting to convert it into a Motion for Summary Judgment." In response, Sears argued that if Grant did not think the case could be disposed based on what was currently on file, then he wanted an evidentiary hearing.

The trial court settled the procedural quandary on the record as follows:

The Court: The evidence here is stipulated to, is that what I'm gathering?

[Sears]: Right.

The Court: *So we're having an evidentiary hearing; it's just stipulated.*

[Sears]: Right. The evidence is the exhibits that are attached.

The Court: But, I don't know that it's stipulated unless you say so, and we're making a record here.

[Grant]: Well, Judge, I am not arguing the authenticity of the exhibits. The Court: Are you stipulating those are the exhibits, however?

[Grant]: Yeah, I will stipulate that those are documents exchanged between the parties and exhibits, and I do not have any objection to foundation or any of those types of things.

The Court: That makes sense.

[Grant]: But if I have to—but I want to make sure it's clear, I'm not saying that, you know admitting any arguments taken in Mr.—

The Court: Yeah, you're controverting those things, but you're willing to stipulate this is the evidence in the case. If a witness were to sit up here, this is what they'd say.

[Grant]: Right.

The Court: And, I can treat that as evidence in making my ruling on [Sears's Motion].

[Grant]: Right.

The Court: Okay. All right. So the record is clear what the procedure is. So it's just a matter of me reading your case law and any other case law I can glean and applying your exhibits and stipulated-to facts that are in those exhibits.

[Grant]: Right.

 Based on this record, and notwithstanding the trial court's statement in the Judgment to the contrary, we conclude that the trial court conducted an evidentiary hearing in response to the Motion, and that the evidence taken at the hearing was admitted by stipulation. The Judgment is not a judgment on the pleadings as " '[t]he question presented by a motion for judgment on the pleadings is whether the moving party is entitled to judgment as a matter of law *on the face of the pleadings.*' " *Eaton*, 224 S.W.3d at 599 (quoting *RGB2, Inc. v. Chestnut Plaza, Inc.*, 103 S.W.3d 420, 424 (Mo.App. S.D.2003)) (emphasis added). In fact, where, as here, "the defending party's pleading denies the [movant's] allegations on material issues . . . it is error for the trial court to enter judgment on the pleadings." [4] *Good Hope Missionary Baptist Church v. St. Louis Alarm Monitoring Co.*, 306 S.W.3d 185, 191 (Mo.App. E.D.2010).

 And we cannot conclude, as the parties request in their briefs, that the trial court tacitly converted the Motion to a motion for summary judgment. "[T]he trial court would have been required to provide notice of its intention to do so[.]" *Eaton*, 224 S.W.3d at 601. That did not occur, and in fact, the trial court expressly advised it would not treat the Motion as a motion for summary judgment.

 Because we conclude that the trial court held an evidentiary hearing on the Motion, we treat the Judgment as a court tried disposition on the merits. "In a court-tried case, we will affirm the judgment below if it is supported by substantial evidence, is not against the weight of the evidence, and does not erroneously declare or apply the law." *Reppy v. Winters*, 351 S.W.3d 717, 720 (Mo.App. W.D. 2011) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)).

## Analysis

Grant asserts three points on appeal. She first asserts that it was error to conclude that the parties reached a settlement agreement as there was no meeting of the minds. In the alternative, Grant asserts that if a settlement agreement was formed, American Family breached the settlement agreement by refusing to tender payment when demanded. Finally, Grant asserts that if a settlement agreement was formed, American Family should be required to pay prejudgment and post judgment interest in addition to the policy limits. Because Grant's first point is dispositive of this appeal, her second and third points need not be addressed.

### Point I

Grant claims that the trial court erred in ordering specific performance of a settlement agreement because there had not been a meeting of the minds on the terms relating to lien waivers, lien information, and lien releases. We agree.

 Sears, as the party moving for enforcement of the purported settlement, "had the burden to prove the existence of

4. In Grant's response to Sears's Motion, she states that she "is not position [sic] to admit any of the unnumbered and unsupported allegations in [Sears's Motion] and denies same[.]"

the settlement agreement by clear, convincing, and satisfactory evidence." *Reppy,* 351 S.W.3d at 721. " 'Evidence is clear and convincing if it instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition, [such that] the fact finder's mind is left with an abiding conviction that the evidence is true.' " *Id.* (quoting *J.H. v. Brown,* 331 S.W.3d 692, 699 (Mo.App. W.D.2011)).

■ "[T]he question of whether the parties entered into an enforceable settlement agreement is governed by contract law. To show a legal, valid settlement agreement, one must prove the essential elements of a contract: offer, acceptance and consideration." *Voyles v. Voyles,* —— S.W.3d ——, 2012 WL 925111 (Mo.App. E.D.2012) (internal citation omitted).

■ An offer must be accepted as tendered to result in a contract. *Payne v. E & B Carpet Cleaning, Inc.,* 896 S.W.2d 650, 651 (Mo.App. E.D.1995). Thus, there is no settlement agreement " 'without a definite offer and a "mirror-image" acceptance.' " *Reppy,* 351 S.W.3d at 721 (citation omitted). "[I]f a purported acceptance contains additional or different terms, it constitutes a counteroffer, which operates to reject the original offer" and no contract is formed. *In re Marriage of Carter,* 862 S.W.2d 461, 467 (Mo.App. S.D.1993) (citing *Nelson v. Baker,* 776 S.W.2d 52, 53–54 (Mo.App. E.D.1989)); *Reppy,* 351 S.W.3d at 721.

Here, there is no dispute that the Demand Letter was an offer. In the Demand Letter, Russell demanded payment of the policy limits and an affidavit that no other coverage was available. According to the trial court, American Family's December 21, 2009 letter was a counteroffer because it accepted these terms, and added the additional terms that Russell provide final lien letters and verify whether or not Grant was a Medicare recipient. On appeal, Grant does not contest the trial court's legal conclusion that American Family's December 21, 2009, letter was a counteroffer.[5]

The trial court then found that Russell's January 7, 2010 letter was "a simple two sentence acceptance of [American Family's] counteroffer." The trial court concluded that the letter's express acceptance of payment of the policy limits and its silence about the additional terms added by American Family's December 21, 2009 letter combined to constitute legal acceptance of the counteroffer. Grant disagrees, and argues that the parties' subsequent conduct confirms that there was not a meeting of the minds with respect to the "additional terms" in American Family's counteroffer. Grant notes that American Family's "counteroffer" required execution of a release, that a modified release was sent by Grant to American Family on January 11, 2009, that American Family indicated the modified release required review

5. It is clear, however, that during the course of the parties' communications, and at the evidentiary hearing, Grant argued alternatively that the December 21, 2009 letter was not a counteroffer, but an outright acceptance of the terms set forth in the Demand Letter. A fair reading of American Family's December 21, 2009 letter could support such a conclusion. The letter accepted the terms of the Demand Letter, then discussed the request for lien information without expressly conditioning acceptance on the provision of the information. And the letter enclosed a form of release which made no reference to the requested lien information. Construed accordingly, Russell's letter of January 7, 2010 "accept[ing] the policy limits of $25,000.00" could be read as merely acknowledging the fact of settlement.

We observe this alternative explanation for the January 7, 2010, letter in response to the hypothetical question posed by the Judgment where the trial court questioned the purpose for Russell's January 7, 2010 letter if not to "accept" of American Family's "counteroffer."

by its legal department, and that it was not until March 15, 2010 that American Family indicated that its legal department had "approved" the release. In the interim, as Grant points out, a flurry of letters between the parties revealed significant discourse about American Family's request for lien information, culminating with Russell's March 10, 2010 letter noting that in negotiating the settlement and the form of release, there had never been any discussion about Grant's obligation to assist American Family in complying with Federal law. Grant thus argues that the January 7, 2009 letter was not a "mirror image" acceptance of American Family's counteroffer, and that there was no meeting of the minds on terms relating to lien issues.

■■■■ We agree with Grant.

A legal, valid settlement agreement must possess all the essential elements of any other contract. The essential elements of a contract are: (1) competency of the parties to contract; (2) proper subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation. The term 'mutuality of agreement' implies a mutuality of assent by the parties to the terms of the contract, i.e., a meeting of the minds.

*Pierson v. Kirkpatrick*, 357 S.W.3d 293, 299–300 (Mo.App. S.D.2012) (citations and quotation marks omitted). "In determining whether a meeting of minds has occurred, [we look to] the objective manifestations of the parties." *B–Mall Co. v. Williamson*, 977 S.W.2d 74, 78 (Mo.App. W.D.1998).

■■■■ "A mutual agreement is reached when 'the minds of the contracting parties [ ] meet upon and assent to the same thing in the same sense at the same time.'" *Kunzie v. Jack–in–the–Box, Inc.*, 330 S.W.3d 476, 483 (Mo.App. E.D.2010) (citation omitted). "'A meeting of the minds occurs when there is a definite offer and an *unequivocal acceptance*.'" *Id.* at 484 (quoting *Guidry v. Charter Commc'ns*, 269 S.W.3d 520, 528 (Mo.App. E.D.2008)).

■■■■ Here, if we accept as correct the trial court's uncontested legal conclusion that American Family's December 21, 2009 letter was a counteroffer, the only support for the trial court's conclusion that Grant "accepted" the counteroffer is that Russell's January 7, 2010 letter was silent about those terms. "As a general common law principle, in order for an acceptance to be effective, it 'must be positive and unambiguous.'" *Id.* (quoting 2 WILLISTON ON CONTRACTS section 6.10 (4th ed.2007)). "'Silence generally cannot be translated into acceptance.'" *Id.* (quoting *Guidry*, 269 S.W.3d at 528).

> Silence and inaction will operate to bind the offeree to a contract in only four categories of cases: 'First, when the offeree, with a reasonable opportunity to reject offered goods or services, takes the benefit of them under circumstances which would indicate to a reasonable person that they were offered with the expectation of compensation. Second, when the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer. Third, when, because of previous dealings or otherwise, the offeree has reasonably led the offeror to understand that the silence or inaction is intended to manifest an acceptance and the offeror understands the silence in this manner. Fourth, when the offeree takes or retains possession of offered property, or otherwise acts inconsistently with the offeror's ownership rights, it will operate as an acceptance of the offered terms absent other circumstances suggesting a contrary intent.'

*Id.* at n. 10 (quoting WILLISTON ON CONTRACTS section 6.50 (4th ed.2007)). None of these four categories apply in this case. The first, third and fourth categories are clearly inapplicable as Grant did not take benefit of any goods or services, there is no evidence of any prior dealings between the parties, and there was no retention of any possessions. Although the second category could be applicable if supported by the evidence, no evidence beyond the silence of the letter itself gave American Family reason to believe that Grant's assent to the additional lien terms had been manifested by silence, and no evidence was elicited to suggest that in remaining silent, Grant intended to accept the additional lien terms. In fact, the conduct of both parties from and after January 7, 2010 as evidenced by their written communications belies such an intention.

■ "The critical question when measuring if a party's words or conduct constitute acceptance 'is whether the signals sent by the offeree to the offeror objectively manifest [Grant's] intent to be presently bound.' " *Id.* at 484 (quoting WILLISTON ON CONTRACTS section 6.10 (4th ed.2007)). " 'A determination of whether an offer has been accepted depends upon what is actually said and done; it does not depend on the understanding or supposition of one of the parties.' " *Muilenburg, Inc. v. Cherokee Rose Design and Build, L.L.C.*, 250 S.W.3d 848, 852 (Mo.App. S.D. 2008) (quoting *Crestwood Shops, L.L.C. v. Hilkene,* 197 S.W.3d 641, 649 (Mo.App. W.D.2006)).

We conclude that the trial court erroneously characterized the silence in Russell's January 7, 2010 letter as acceptance of terms added by American Family's December 21, 2009 letter.

■ Sears argues that Russell's January 7, 2010 letter must be construed as an acceptance of American Family's counteroffer, because Russell's only options were to accept American Family's December 21, 2009 counteroffer, or to tender a counteroffer in response. Sears offers no authority for this proposition. " 'When an appellant cites no authority and offers no explanation why precedent is unavailable, appellate courts consider the [argument] waived or abandoned.' " *Williams v. Belgrade State Bank,* 953 S.W.2d 187, 190 (Mo.App. S.D.1997) (citation omitted). Moreover, there is an alternative not mentioned by Sears. As was argued to the trial court during the evidentiary hearing, Russell could have construed American Family's December 21, 2009 letter as acceptance of the terms of the Demand Letter, and the additional discussion about lien information as reference to nonmaterial details involved in consummating the settlement. Certainly, had American Family intended its request for lien information to have been an obvious expression of conditional acceptance of the terms of the Demand Letter, it would not have been unreasonable to expect American Family to make that point clear.

■ In this respect, the facts before us are similar to those in *Reppy.* Reppy was seriously injured in an automobile collision with Winters. 351 S.W.3d at 719. Reppy's counsel sent a letter to Winters's insurer demanding the policy limits to settle Reppy's claims and requiring affidavits excluding the prospect of other available insurance coverage. *Id.*

Winters's counsel replied stating that Reppy's demand for policy limits was accepted but added, "Additionally, it is not clear from our file whether [Reppy's] settlement proceeds are subject to any type of medical ... lien. As such, we will proceed forward with the settlement *with the understanding that your office will be responsible to indemnify our client, his insurer, and our office for any type of lien.*" *Id.* (emphasis added).

Reppy's counsel replied by providing the firm's Tax ID number, requesting that the check be made out to Reppy's counsel, requesting the release that Winters would like Reppy to execute, and the affidavits from Winters and Winters's insurer. *Id.* Additionally, Reppy's counsel stated, "At this time, we are not aware of any such liens, but in any event, our client does not agree to indemnify any party against any liability related to liens or subrogation rights.... If you insist on this indemnification as a condition of settlement, we will consider it a rejection of our offer to settle this matter within the applicable policy limits, retract our offer, and proceed with litigation.. [.]" *Id.* at 720.

Winters responded by notifying Reppy of a $96,489.94 medical lien and requested confirmation of how that lien would be satisfied. *Id.* Reppy responded stating that Winters's letter stating that Reppy would indemnify others was not an acceptance of Reppy's settlement offer for policy limits. *Id.* Shortly thereafter, Reppy filed suit against Winters. *Id.* Winters filed a Motion to Dismiss and to Enforce Settlement. *Id.* After an evidentiary hearing, the trial court granted the motion and entered judgment in favor of Winters. *Id.*

On appeal, we reversed the trial court's decision finding that Winter's general acceptance of the demand for payment of the policy limits was expressly **conditioned** on the understanding that Reppy's counsel would be responsible to indemnify for liability for any type of lien, and was thus a counteroffer. *Id.* at 721. We held that Reppy unequivocally rejected this additional term, and thus never accepted the counteroffer. *Id.*

The clarity evident in the communications in *Reppy* is sorely absent from the communications between American Family and Grant. There was no express effort by American Family in its December 21, 2009 letter to condition its general acceptance of the terms in the Demand Letter by requirements addressing lien information and waivers. And Grant's response to the December 21, 2009 letter hints at no sense of an appreciation by Grant that American Family's references to lien information were intended as an additional material term of settlement. Russell's January 7, 2010 response letter states only that "[o]n behalf of my client, Angela Grant, we hereby *accept the policy limits of $25,000.*" (Emphasis added.) This wording suggests that, while Grant was willing to accept the *settlement amount* offered by American Family, Grant was not aware of, or did not agree to, any additional settlement terms on which American Family's acceptance of the demand for payment of policy limits was conditioned. Thus, even accepting that the December 21, 2009 letter (despite its lack of clarity) was a counteroffer, we are simply not persuaded that Sears has clearly, convincingly and satisfactorily established Grant's acceptance of American Family's additional terms. In short, Sears has not clearly, convincingly and satisfactorily established that there was a meeting of the minds as of January 7, 2010.

We are influenced in this conclusion by American Family's conduct from and after January 7, 2010, the date Sears claims a binding settlement was reached. American Family's December 21, 2009 letter asked only for (i) a final lien letter from First Recovery Group, and (ii) verification about Grant's status as a Medicare patient. On February 22, 2010, American Family began insisting on receipt of detailed personal information from Grant to permit it to abide by federal reporting requirements, and thereafter unilaterally insisted that any settlement check must either be jointly issued to include lien holders, or that Russell would be required to indemnify American Family for the claims of lien holders. During this time frame, American Family employed language in its let-

ters to Russell advising that the modified release signed by Grant had been approved by its legal department (March 15, 2010 letter), advising that "we received your demand for settlement," (March 26, 2010 letter), and observing that "an offer was previously made to conclude this matter" (September 6, 2010 letter). Sears cannot have it both ways. Sears cannot on the one hand claim that the material terms of a settlement were determined as of January 7, 2010, while ignoring that American Family's conduct after that date suggested otherwise.

Sears also argues that as a matter of public policy, Grant should not be permitted to demand the payment of policy limits without the implicit understanding that acceptance of that demand carries with it an obligation to provide whatever information is necessary to protect Medicaid and/or other lien holders, and to protect insurance companies who are bound by Federal law to report settlements with Medicare recipients. American Family is suggesting that we imply material terms into settlement contracts by judicial construct. We are not so inclined.

We conclude that Sears failed to satisfy his burden of proving by clear, convincing and satisfactory evidence that the parties reached a meeting of the minds sufficient to form an enforceable settlement agreement as of January 7, 2010. *Reppy*, 351 S.W.3d at 721. The trial court erred in concluding that an enforceable settlement was reached on January 7, 2010 and in entering a Judgment enforcing that agreement. Accordingly, Grant's first point on appeal is granted.[6]

**6.** Our disposition of Grant's first point on appeal renders Grant's second and third points on appeal moot.

**7.** We offer no opinion on the merits of Grant's threatened intention to pursue American Family for bad faith refusal to settle should

## Conclusion

We reverse the trial court's judgment granting Sears's Motion and remand this matter for further proceedings consistent with this Opinion.[7]

All concur.

Grant procure a judgment against Sears in excess of the policy limits. This Opinion addresses and disposes only the narrow issue of whether there was a meeting of the minds sufficient to form an enforceable settlement agreement as of January 7, 2010.