**STE. GENEVIEVE COUNTY LEVEE DISTRICT # 2, Respondent,**

**v.**

**LUHR BROS., INC., Appellant.**

**No. ED 91297.**

Missouri Court of Appeals,
Eastern District,
Southern Division.

June 16, 2009.

Bart C. Sullivan, Saint Louis, MO, for Appellant.

Clinton B. Roberts, Farmington, MO, for Respondent.

## OPINION

GLENN A. NORTON, Judge.

Luhr Bros., Inc. ("Contractor") appeals from the judgments of the trial court (1) denying its motion for summary judgment and (2) enforcing the settlement between Ste. Genevieve County Levee District # 2

(the "Levee District") and Contractor. We affirm.[1]

## I. BACKGROUND

Following the flood of 1993, the United States Army Corps of Engineers (the "Corps") awarded a construction contract to Contractor for the construction of a portion of a levee project in Ste. Genevieve County. The levee project was performed pursuant to a Project Cooperation Agreement (the "PCA") executed by the Corps and the Ste. Genevieve County Levee Commission (the "Commission"), of which the Levee District was a member.

After the levee project was completed, the Levee District brought suit against the Contractor asserting claims of trespass and conversion based on allegations that Contractor exceeded the scope of the PCA by removing gravel and other material from the project site. The Levee District's petition was filed on April 27, 2004.

On September 9, 2005, Emerald Loida, president of the Levee District, met with Mike Luhr, Contractor's president, to discuss settlement. At the meeting, Loida and Luhr discussed the value of the rock allegedly removed by Contractor. Loida testified that while the Levee District had initially demanded a higher price per yard, Luhr presented an offer to settle the Levee District's claims for $6.63 per yard, or $218,790.[2] Loida told Luhr that he would have to call a board meeting and seek approval from the majority of the Levee District's board of directors before he could agree to settle the lawsuit. Loida and Luhr agreed to meet again following

1. The Levee District filed a motion to dismiss Contractor's appeal, which this Court took with the case. In support of its motion to dismiss, the Levee District argues that Contractor's statement of facts violates Rule 84.04(c). We do not believe that Contractor's brief offends Rule 84.04(c) to such an extent as to warrant a dismissal. The Levee District's motion to dismiss Contractor's appeal is denied.

2. The amount of rock and material allegedly improperly taken from the site was 33,000 yards.

Loida's meeting with the Levee District's board.

The Levee District's board met on September 16, 2005, and, after much discussion, agreed to authorize Loida to settle the case for $218,790. Loida and Luhr met again on November 30, 2005. At the November 30 meeting, Loida told Luhr that the Levee District accepted Contractor's offer; however, after Loida's acceptance, Luhr informed Loida that the Corps rejected the proposed settlement and therefore he was not authorized to settle the case.

Following the November 30 meeting with Luhr, Loida reported back to the board's secretary that upon accepting the offer, "Luhr backed off on it." There is no written confirmation or documentation of a settlement. The testimony showed that the members of the Levee District's board did not think that they could enforce the settlement. Consequently, over two years passed, and the case was set for trial.

Thereafter, Contractor filed a motion for summary judgment on the grounds that the Levee District's claims were barred because Contractor was protected by the doctrine of governmental immunity. The trial court denied the Contractor's motion.

The week before trial was set to commence, the Levee District filed a motion to enforce settlement. On January 30, 2008, the day the case was set for trial, the court held a hearing on the Levee District's motion. The court asked the Levee District why it waited over two years to file its motion. Counsel for the Levee District explained that his clients only recently told him about the settlement because they did not think that they could compel its enforcement. In response to the Levee District's motion, Contractor argued that no settlement was reached between the parties because no offer was made by Luhr and therefore no meeting of the minds could have occurred. Contractor also argued that the Levee District should be precluded, on the basis of equity, from enforcing any alleged settlement. Ultimately, the court granted the Levee District's motion and entered judgment enforcing the terms of the settlement. Contractor appeals.

## II. DISCUSSION

■ Contractor raises two points on appeal. However, as Contractor's second point does not merit detailed analysis, we address it first. In Contractor's second point on appeal, it argues that the trial court erred in denying Contractor's motion for summary judgment. Generally, an order denying a party's motion for summary judgment is not a final judgment and is therefore not subject to appellate review. *Hussmann Corp. v. UQM Electronics, Inc.*, 172 S.W.3d 918, 922 (Mo.App. E.D. 2005). Accordingly, Contractor's second point is denied.

## A. The Levee District's Motion to Enforce Settlement

In the sole point subject to our review, Contractor argues that the trial court erred in entering its judgment enforcing a settlement between the parties.

### 1. Standard of Review

■ When reviewing a trial court's judgment enforcing a settlement, we will affirm unless the judgment is against the weight of the evidence, there is no substantial evidence to support it, or the court erroneously applied or declared the law. *Woods ex rel. Woods v. Cory*, 192 S.W.3d 450, 458 (Mo.App. S.D.2006), *citing Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We view the evidence in the light most favorable to the trial court's judgment, disregarding all contrary inferences and evidence. *Woods*, 192 S.W.3d at 458. We "defer[ ] to the trial court's findings of fact, recognizing the superior abili-

ty of the trial court to judge the credibility of the witnesses." *Id.* Thus, we will set aside a judgment as against the weight of the evidence only upon a firm belief that the trial court was wrong. *Id.*

Moreover, "[a] motion to enforce settlement adds a collateral action for specific performance of the agreement." *Kenney v. Vansittert,* 277 S.W.3d 713, 720 (Mo.App. W.D.2008). Because specific performance is an equitable remedy, we will afford the trial court great deference in ruling on the motion. *Id.*

**2. The Trial Court's Judgment Enforcing the Settlement between Contractor and the Levee District is Supported by Substantial Evidence and does not Erroneously Apply the Law**

Contractor argues that the trial court erred in entering its judgment enforcing a settlement between the parties because the evidence does not support a finding that a valid offer to settle the lawsuit was made by Contractor and accepted by the Levee District and, in the alternative, because principles of equity preclude enforcement of any settlement.

**a. The Evidence Supports a Finding that an Enforceable Settlement Agreement Existed Between the Parties**

A party seeking to enforce a settlement must prove the existence of a settlement by clear, convincing and satisfactory evidence. *Eaton v. Mallinckrodt, Inc.,* 224 S.W.3d 596, 599 (Mo. banc 2007). The question of whether the parties entered into an enforceable settlement agreement is governed by contract law. *Emerick v. Mutual Benefit Life Insurance Co.,* 756 S.W.2d 513, 518 (Mo. banc 1988). To show a legal, valid settlement agreement, one must prove the essential elements of a contract: offer, acceptance and consideration. *Tinucci v. R.V. Evans Co.,* 989 S.W.2d 181, 184 (Mo.App. E.D.1998). The

creation of a valid settlement agreement requires a meeting of the minds and a mutual assent to the essential terms of the agreement. *Emerick,* 756 S.W.2d at 518.

Contractor argues that there was no valid settlement agreement because no offer was extended to the Levee District and therefore there was no meeting of the minds and mutual assent of the parties. Instead, Contractor characterizes the September 2005 meeting as "an invitation [to Loida] to negotiate a settlement." According to Contractor, Luhr was requested by the Corps to meet with Loida and attempt to arrive at a more "reasonable number" from the amount that the Levee District was demanding. Contractor claims that neither Luhr nor Loida had settlement authority; Loida needed approval of the board of the Levee District and Luhr's settlement authority was dependent upon the Corps's approval. Contractor points to Luhr's testimony that he told Loida that he would take the agreed-upon figure ($218,790) to the Corps for approval as evidence that no offer was made. We disagree.

The evidence before the trial court supported a finding that an offer was made by Luhr and accepted by Loida. Despite attempts during cross-examination by Contractor's attorney to characterize the meeting between Luhr and Loida as an "invitation to bid," Loida consistently testified in his deposition that Luhr made an offer of $218,790 to settle the Levee District's claims. At Loida's deposition, Contractor's counsel asked whether Loida and Luhr "discussed how much Levee District # 2 would need to settle the case." Loida responded, "What he offered us is what I told you and then we had a—I called a meeting [with the Levee District board to discuss] whether we would accept that offer." During cross-examination the follow-

ing colloquy took place between Contractor's counsel and Loida:

Q: So you came up with a number, right?

A: Came up with what number?

Q: The $218,000 number?

A: No. They offered me that. They came up with this. They came up with this yard, and they came up with the price per yard.

Later, Loida stated, "I didn't put the number together, what Mr. Luhr gave me. They put the number together." Counsel for Contractor then asked Loida, "So, it's your testimony that Mr. Luhr simply came to you and offered $218,000, and you said, I'll go back and talk to Levee District 2, right?" Loida responded, "Yes."

Loida's testimony before the trial court at the hearing on the Levee District's motion to enforce settlement was consistent with his deposition testimony. Loida testified on direct examination as follows:

Q: Did Mike Luhr make any settlement offer to you?

A: Yes.

Q: And what was that offer?

A: I have it here exactly. It was—it was $218,790.

Q: And was that for the purpose of settling this litigation?

A: Yes, it was.

Q: An when he made that offer was it contingent upon anything; that is now, this offer is valid if something else happens, or was it just a flat offer?

A: It was a flat offer.

At the hearing before the trial court, the Levee District presented, through the Levee District's board's secretary, Tom Kraenzle, the minutes of the board meeting at which the potential settlement was discussed. Kraenzle read into evidence the following excerpt from the minutes of the board meeting:

Emerald Loida opened the meeting and explained how he had met with Ron Inman and Mike Luhr the previous Friday to try to resolve the problem. He stated that Inman and Luhr made him a settlement offer of $218,790.00 for 33,000 yards of rock at 6.63 per yard, instead of the original 41,570 yards that the District was asking to be paid for.

Kraenzle further testified, based on his independent recollection, that Loida presented to the Levee District board an offer to settle made by Luhr, and that the board agreed to accept that offer.

The testimony of Loida and Kraenzle, together with the minutes of the meeting of the Levee District's board, support a finding that an offer was made at the September 9, 2005 meeting, that this offer was presented to the board, and that the board granted Loida the authority to accept the offer. We recognize that Luhr testified that he did not make an offer to Loida; however, the trial court heard all of the testimony and is in the best position to judge the credibility of the witnesses. *Woods,* 192 S.W.3d at 458. Moreover, we view the evidence in the light most favorable to the trial court's judgment and disregard all contrary inferences and evidence. *Id.* The trial court, in enforcing the settlement, rejected Contractor's attempts to characterize the September 2005 meeting as an invitation by Contractor to enter into negotiations. The evidence cited above supports not only a finding that an offer to settle the lawsuit was made by Contractor, but also that it was accepted by the Levee District prior to any purported revocation by Luhr. *See I.R. Kirk Farms, Inc. v. Pointer,* 897 S.W.2d 183, 185 (Mo.App. W.D.1995) (revocation of an offer is effective only if made prior to acceptance). Accordingly, we find that the trial court's determination that a settlement agreement was reached by the parties is supported by the evidence.

### b. Equity does not Bar Enforcement of the Settlement Agreement

Having found that the evidence supported the trial court's determination that a settlement agreement was reached, we must now consider whether the Levee District should be equitably precluded from enforcing the settlement. Contractor argues that the doctrine of laches precludes the Levee District from enforcing the settlement. Alternatively, Contractor argues that the settlement was abandoned by the Levee District and therefore the Levee District should be barred from enforcing the agreement.

### i. Laches

The equitable doctrine of laches provides that "unreasonable delay bars a claim if the delay is prejudicial to the party asserting the laches defense." *Northwest Plaza, L.L.C. v. Michael–Glen, Inc.*, 102 S.W.3d 552, 558 (Mo.App. E.D. 2003) (internal citations omitted). Reliance upon the doctrine of laches requires a party to show an unreasonable delay for an "unexplained length of time." *Ewing v. Ewing*, 901 S.W.2d 330, 333 (Mo.App. W.D. 1995). "Mere delay in asserting a right does not of itself constitute laches; the delay involved must work to the disadvantage and prejudice of the defendant." *Id.*

When questioned by the trial court regarding the delay in attempting to enforce the settlement, counsel for the Levee District explained that, following the Levee District's acceptance of Contractor's offer, Luhr "backed off" from the offer, claiming that the Corps would not authorize settlement at that figure. Although contract law prohibits the revocation of an offer after a valid acceptance has been made, *I.R. Kirk Farms, Inc., supra*, the Levee District's counsel explained that its members did not understand that the agreement with Contractor could be enforced. As a result, the members did not tell their attorney about the settlement until just before trial.

Thus, the Levee District provided an explanation for its delay in attempting to enforce the settlement agreement. Where a party offers an explanation for the delay, equity does not compel the application of the doctrine of laches to preclude enforcement of an agreement. *See Ewing, supra.* Moreover, Contractor fails to point to any evidence of disadvantage or prejudice. Disadvantage and prejudice requires a showing of legal detriment. *Blackburn v. Richardson*, 849 S.W.2d 281, 289 (Mo. App. S.D.1993). "The prejudice and disadvantage which supports laches is generally of two kinds: (1) the loss of evidence which would support [a party's] position and (2) a change in position in a way that would not have occurred but for the delay." *Port Perry Marketing Corp. v. Jenneman*, 982 S.W.2d 789, 792 (Mo.App. E.D.1998). Contractor does not assert that evidence was lost or that its position changed in any way as a result of the Levee District's delay in enforcing the settlement. Contractor only claims that it was disadvantaged because it had to spend time and money preparing for trial. We find that mere inconvenience and expense does not constitute legal detriment. Accordingly, the trial court's determination that the doctrine of laches does not operate to preclude the Levee District from enforcing the settlement is supported by the evidence.

### ii. Abandonment

Finally, Contractor argues that the Levee District abandoned any settlement by proceeding with the litigation rather than moving to enforce the settlement. We disagree.

Contractor suggests that our decision in *Neiswonger v. Margulis*, 203

S.W.3d 754 (Mo.App. E.D.2006) supports his argument that the Levee District abandoned the settlement. Our decision in *Neiswonger* was consistent with the established rule that if a defendant refuses to comply with a settlement agreement, the plaintiff may choose to enforce the settlement agreement or abandon the agreement and proceed under the original cause. *Id.* at 760.

*Neiswonger*, however, does not support a finding of abandonment in this case. In *Neiswonger*, the plaintiff sent a demand letter to the defendants after which the parties attempted to settle the plaintiff's potential claims. *Id.* at 757. More specifically, the defendants agreed to return a portion of a retainer in exchange for the plaintiff's execution of releases from professional liability. *Id.* Thus, the settlement agreement was reached before any lawsuit was filed. *Id.* Thereafter, upon the defendants' failure to pay as agreed, the plaintiff filed his lawsuit for professional negligence. *Id.* We found that the plaintiff's act of filing a multi-count lawsuit against the defendants constituted abandonment of the settlement agreement. *Id.* at 760–61.

■ In *Neiswonger*, we stated that "[a]bandonment of an agreement may be accomplished by express mutual consent or implied consent through the actions of the parties. Actions indicative of implied consent must be positive, unequivocal and inconsistent with an intent to be further bound by the contract." *Id.* at 760 (internal citations omitted). Thus, it is clear from *Neiswonger* that abandonment must be proven by the showing of an overt act indicating an intent not to be further bound by the contract. In *Neiswonger*, the overt act of filing a lawsuit *after* the defendant's failed to perform under the terms of the settlement agreement constituted abandonment. *Id.* at 760–61.

Unlike in *Neiswonger*, in this case the settlement agreement was made during the course of litigation, after the lawsuit was filed. Contractor is unable to point to a positive and unequivocal act on the part of the Levee District that is inconsistent with an intent to be further bound by the settlement agreement. We find that continuing to litigate a lawsuit that was filed prior to a settlement agreement does not amount to abandonment of such agreement. The evidence did not show that the Levee District had an express or implied intent to abandon the settlement, but only that its members did not understand that they could enforce the settlement agreement. Accordingly, the Levee District did not abandon the settlement agreement with Contractor.

### c. Conclusion

The evidence supports trial court's determination that a settlement agreement was reached by the parties. The equitable doctrines of laches and abandonment do not preclude the Levee District from enforcing the settlement. Accordingly, the judgment enforcing the settlement between Contractor and the Levee District is supported by substantial evidence and does not erroneously apply the law. Point one is denied.

### III. CONCLUSION

The judgments are affirmed.

NANNETTE A. BAKER, C.J., and KATHIANNE KNAUP CRANE, J., concur.