

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| ELENA PUGA | ) | |
| AND NICOLE EDWARDS, | ) | |
| ON BEHALF OF THEMSELVES | ) | |
| AND ALL OTHERS SIMILARLY | ) | |
| SITUATED, | ) | |
| | ) | **WD87149** |
| Appellants, | ) | |
| | ) | **OPINION FILED:** |
| V. | ) | **SEPTEMBER 10, 2024** |
| | ) | |
| NEPHRITE FUND I, LLC, ET AL., | ) | |
| | ) | |
| Respondents. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable James Kanatzar, Judge

Before Division Four:  Anthony Rex Gabbert, Chief Judge, Presiding, Lisa White
Hardwick, Judge and Gary D. Witt, Judge

Elena Puga, et. al. ("Appellants") appeal from the judgment of the Circuit Court of
Jackson County, Missouri ("trial court") denying their motion to enforce a settlement
agreement between themselves as representatives of a class, and Nephrite Fund I, LLC,
Jesse Davila, and Strategic Properties, LLC (collectively "Respondents").  In their sole
point on appeal, Appellants contend the trial court erred in denying their motion to
enforce settlement because there was a meeting of the minds as to the material terms of
the agreement, resulting in a valid and binding settlement agreement.  We affirm the

judgment of the trial court that no settlement agreement was reached and remand for further proceedings.

## Factual and Procedural Background[1]

This class action against Respondents began in June 2021. Collectively, Respondents are responsible for the ownership and management of Suncrest Apartments ("Apartment"), located in Raytown, Missouri, which is the subject of this dispute.[2] Appellants' class includes Missouri residents "who had a lease with or rented an apartment unit at Suncrest Apartments (formerly known as Amber Glenn Apartments) between June 17, 2016 to the present." Appellants contend Respondents failed to maintain the Apartment in a safe, sanitary, and habitable condition, and allege three counts against Respondents: Count I, negligence; Count II, breach of the implied warranty of habitability; and Count III, violations of the Missouri Merchandising Practices Act ("MMPA").

Relevant to this interlocutory appeal, the parties agreed to participate in a mediation that was held on October 17, 2023, less than two weeks before a jury trial was scheduled to commence. The parties were unable to reach a settlement agreement during the mediation. Afterward, the mediator sent an email to the parties listing potential terms as "a starting point for additional discussions" between the parties.[3] The parties

---

[1] "We defer to the trial court's determinations of credibility and view the evidence and the inferences that may be drawn therefrom in the light most favorable to the judgment." *Schubert v. Schubert*, 366 S.W.3d 55, 62 (Mo. App. E.D. 2012) (internal citation omitted).

[2] Nephrite Fund I, LLC ("Nephrite") bought the Apartment in September 2014. Jesse Davila is an owner, manager, member, and registered agent of Nephrite. Strategic Properties, LLC manages the Apartment.

[3] The mediator's potential settlement terms were as follows:

continued to negotiate and discuss a potential settlement. Partially inspired by the terms the mediator set forth, Appellants' counsel, G.L., drafted a settlement offer and sent it to the mediator to forward to Respondents' counsel, B.G.[4] In relevant part, the settlement offer included the following terms:

1. The class accepts all aspects of paragraph 1 of [the mediator]'s email and incorporates paragraph 1 in this demand. In addition, [Owner of Nephrite] must not be directly involved in providing these improvements in order to avoid substandard labor and inferior construction.
2. Cash [payment] of $1.5 million from any combination of defendants and insurance companies.
3. Rent reduction of $250 per month per tenant for November [,] December [, and] January (time period of notice and final approval of settlement). This reduction does *not* involve government payments, so those can continue. This rent reduction involves only direct payment from tenants.
4. Case continued by agreement. Plaintiffs will pursue a 537.065 claim, amend the petition within 20 days of settlement execution, and take a

---

1. Defendants will put $400,000 into the complex as improvements for habitability (not beautification), in November 2023, and those expenditures shall be subject to approval by [G.L.] or his appointee. . . .
2. The cash offer of $150,000 from the defendants and at least $150,000 from the insurance [company] will be paid immediately upon the settlement agreement signed and approved. We will jointly push [insurance company] to increase its participation to $250,000.
3. Rent paid by each member of the class shall be reduced by $100 for each of the months of November and December 2023 and January 2024. This is dollars the individuals [] pay not the subsidized amount. . . .
4. Plaintiffs will receive 50% equity upon sale of the complex. [G.L.] will have a lien on the complex for that %.
5. The case will be continued by agreement. If [G.L.] wants to, he will pursue a 537.065 claim. He may, if he desires, amend the petition and take a judgment for negligence only to be pursued against all other insurance companies. The defendants will not oppose any of this and will agree to any such pleadings. Defendants will within 7 days provide a full and complete list of all such possible liability insurance.

[4] Pursuant to section 509.520, RSMo. (2023), we do not include the names of witnesses other than parties.

Judgment on Negligence count to be pursued only against insurance companies. Defendants will not oppose any of this. Defendants provide a sworn statement containing a complete list of all possible liability insurance within 7 days of execution of settlement. The list must contain all possible liability insurance for all of the defendants from 2016 through 2024.

5. The parties agree to entry of Final Judgment on claim for breach of the warranty of habitability as part of the executed settlement. Judgment will be in the amount of $2 million to be pursued only against the insurance companies and/or the property. The parties further agree that no lien on the property is superior to the class's Judgment lien with the sole exception of the first and second mortgages.

6. All defendants are prohibited from owning or managing any apartment complex in the state of Missouri for 10 years. . . .

7. Defendants shall not object, dispute or comment upon any request by the class or class counsel for incentive awards, attorney's fees or reimbursement of case expenses.

8. Defendants shall immediately and forever cease filing rent and possession or eviction cases against any class member for alleged default of payment obligations arising from a lease at [the Apartment]. Defendants shall cease all collection efforts relating to the alleged default of payment obligations.

B.G. responded to the mediator, explaining that the most Appellants would ever be able to collect from Respondents is the net proceeds from the sale of Apartment, which was estimated to be around $300,000, "after secured creditors are paid off." Respondents did not accept Appellants' settlement offer.

Throughout the negotiations, the founder and CEO of Strategic Properties, LLC ("Founder") communicated directly with Appellants' counsel, G.L., with Respondent's counsel, B.G.'s consent and without Respondent's counsel being present or on the phone. During at least one conversation between Founder and G.L., they spoke about the Apartment's liens and lien priority. Founder told G.L. there was little equity in the Apartment due to outstanding liabilities and liens, and sent G.L. spreadsheets confirming

4

this information.  Founder testified his sole priority with any arrangement between Appellants and Respondents was to make sure any settlement did not "touch the debt that [Strategic Properties, LLC ("Strategic") and non-party SP Investment Groups, LLC ("SPIG")] were owed from the property."[5]  Founder believed he made his stance on lien prioritization very clear to G.L. throughout negotiations.  Initially, Respondents believed certain creditors had secured and/or perfected their lien interests in Apartment, such that any stipulated judgment against the property would be subordinate to the creditors' interests; however, Respondents eventually learned their understanding may be incorrect.

On October 25, 2023, G.L. sent the mediator a final settlement demand consisting of the following ten terms to present to B.G.:

1.  $600,000 cash to be paid to [G.L], class counsel and in trust for the class, no later than 14 days after the Court gives preliminary approval of settlement.
2.  $150 per month in rent reduction to every tenant for a period of three months following execution of a written settlement agreement.  This rent reduction is limited to money owed by a tenant and does not involve money paid by the government.
3.  Parties agree to Stipulated Judgment of Count II in the Second Amended Petition (Breach of Warranty of Habitability) in the amount of $4 million to be pursued against the insurance companies and/or the property.
4.  The parties agree to a continuance of the trial set for October 30, 2023 in order to allow plaintiffs to proceed under RSMo 537.065 against all insurance companies that provided any insurance policy relating to [the Apartment], whether or not coverage was accepted, declined or a reservation of rights was asserted.  Plaintiffs shall have 30 days to amend the negligence count and seek Judgment in their favor on negligence.  Defendants agree that they will not object to or oppose

---

[5] Strategic and SPIG had loaned money to Nephrite to use for improvements to the Apartment.  Founder is also the manager and part owner of SPIG and wanted to ensure that those loans would be repaid from the sale of the Apartment.  Founder believed a UCC Financing Statement provided SPIG with lien priority over any stipulated judgment in this class action.

plaintiffs' motion to amend or request for Judgment on the negligence count. Defendants further agree to provide in writing a complete list of all insurance companies and policies that might provide coverage relating to their liability at [the Apartment] within 7 days of execution of the settlement agreement.

5. Defendants agree to an immediate cessation of all collection and eviction attempts against any class member or tenant of [the Apartment] from 2016 to present. Following execution of the settlement agreement, defendants agree to dismiss all pending collection and rent and possession cases involving a class member or tenant of [the Apartment] within 3 days.

6. Defendants agree that they will not object, dispute or make any comment on any application for attorney's fees, request for expense reimbursement, or incentive award that the class and its counsel may seek from the Court. The request for fees, expense reimbursements and incentive awards will be from the common fund created by the settlement, as set forth in paragraph 1 above.

7. Defendants shall pay all costs of any notice to the class arising from this settlement, publication, or mailing of a proof of claim form, and any subsequent administration of the common fund following the 537.065 proceedings or sale of [the Apartment].

8. Within 3 days of execution of the settlement agreement, Defendants agree to reimburse class counsel for costs associated with defendants' unilateral cancellation of depositions. . . .

9. Defendants shall pay all mediation costs.

10. All Orders entered by the Court in this case shall continue to have effect until this dispute is finally determined, including by resolution of any 537.065 claims, or the sale of [the Apartment], or an appeal.

Absent from term three of the October 25, 2023 settlement demand was the previously proposed term that provided Appellants' judgment lien would be subordinate to the first and second mortgages on the property.

After several phone calls and text messages, G.L. texted Founder requesting confirmation that the "deal [was] dead." Subsequently, G.L. and Founder spoke on the phone. Founder communicated to G.L. that he was concerned about the stipulated judgment touching the debt Strategic and SPIG were owed from the Apartment because if

6

the Apartment's current liens were not prioritized, the settlement agreement would be of no benefit to the Respondents. Founder alleged G.L. assured him that any stipulated judgment and resulting lien would be subordinate to any existing liens on the property; however, G.L. asserts he never agreed to subordinate the judgment lien. After the call, G.L. texted Founder and characterized the four-million-dollar stipulated judgment as a "paper number," asserting that Founder "didn't care what the number [was] [because] equity was low . . . ." Founder interpreted G.L.'s text to mean that the stipulated judgment would eventually be collectible against insurance companies and the judgment would not impact the Apartment's outstanding liabilities. Based on Founder's conversations with G.L., Founder agreed to the cash demand and the stipulated judgment subject to these limitations.

The next morning on October 26, 2023, the parties spoke on the phone to negotiate the final terms of the proposed agreement. On the call, the parties discussed each of the ten terms from Appellants' final settlement demand, and Respondents agreed to all but one term. During their call, the mediator called G.L. and joined the parties' conversation. Ultimately, the parties reached a resolution as to a disputed term regarding the timing of one of the payments under the settlement. Respondents believed any confusion about lien prioritization as to the Apartment had been resolved based on various prior conversations with G.L., and thus there was no conversation about lien priority at that time. At the end of the call, the mediator congratulated the parties.

After the call, G.L. sent B.G. drafts of the proposed settlement agreement, joint motion for preliminary approval of settlement, and notice to the class. The drafted

7

settlement agreement provided in paragraph 3 that the parties would enter into a "Stipulated Judgment of Count Two in the Third Amended Petition (Breach of the Implied Warranty of Habitability) . . . ." Paragraph 4 of the draft of the settlement agreement provided that the Appellants would then have thirty days to amend the negligence count and seek judgment on the count of negligence. B.G. notified G.L. that he sent the documents to his "clients to review/approve" and that B.G. would stop by G.L.'s office later that afternoon "to hash out the final details." G.L. wrote "[Founder] will agree. Do you [sic] other client's [sic] approval?" B.G. responded that his clients agreed in principle, but they needed to discuss a couple of issues. Prior to meeting G.L. at his office, B.G. notified the trial court of the parties' "tentative settlement agreement," asserting the parties were in the process of finalizing terms and would let the trial court know when a final settlement was reached. Further, G.L. requested to use the parties' pre-trial conference, set for the next day, to present to the trial court a joint motion for preliminary approval of settlement; the trial court agreed.

Later that same afternoon, B.G. visited G.L.'s office and reviewed the settlement paperwork which included the joint motion for preliminary approval of settlement, notice of class action, guaranty, stipulated judgment, and settlement agreement. There was no language in the draft settlement agreement addressing lien priority. As a result, B.G. told G.L. that while his clients did not oppose many of the material terms proposed, Respondents would not agree to the settlement unless the stipulated judgment was subordinate to the other lien interests in Apartment. G.L. refused to add this language, asserting a valid settlement was reached during their phone call that morning. B.G.

8

stepped outside to call and speak with Founder about this disagreement. Once B.G. returned to G.L.'s office, with Founder on the phone, B.G. repeated Respondents' request to include language about lien priority which G.L. refused. Ultimately, B.G. did not sign the drafted documents on behalf of Respondents because Respondents did not agree to the proposed settlement terms. That night, Respondents offered to increase the amount to be paid to Appellants from the settlement if they agreed to Respondents proposed lien priority term; Appellants did not accept.

The next morning Appellants filed a motion to enforce settlement asserting the parties reached a valid settlement agreement during their phone conversation the morning of October 26, 2023. An evidentiary hearing was held and the trial court denied the Appellants' motion. The trial court held the Appellants failed to prove the existence of a settlement by clear, convincing, and satisfactory evidence that there was a meeting of the minds between the parties as to "issues pertaining to priority of payment of debts and/or liens out of the equity of the subject property, [Apartment], which was a material and/or essential term of a proposed settlement agreement between the parties." The trial court amended its order and entered a judgment denying Appellants' motion, and pursuant to Rule 74.01(b),[6] certified the judgment for immediate appeal, finding there was "no just reason for delay." This appeal follows.[7]

---

[6] All rule references are to the Missouri Supreme Court Rules (2024).
[7] "A motion to compel settlement adds to a pending action a collateral action for specific performance of the settlement agreement." *Stickler v. McGinnis*, 649 S.W.3d 38, 44 (Mo. App. W.D. 2022) (internal citation and quotation omitted). Under Rule 74.01(b), a judgment that does not resolve all claims by and against all parties may be certified as a "final judgment" for interlocutory appeal. Here, the trial court properly certified its order and judgment denying

9

**Standard of Review**[8]

"This Court will affirm a trial court's judgment in a court-tried case unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Hunter v. Moore*, 486 S.W.3d 919, 925 (Mo. banc 2016). "We view the evidence in the light most favorable to the trial court's judgment, disregarding all contrary inferences and evidence." *Ste. Genevieve Cnty. Levee Dist. #2 v. Luhr Bros., Inc.*, 288 S.W.3d 779, 782 (Mo. App. S.D. 2009) (internal citation omitted). Thus, "[w]e defer to the trial court's findings of fact, recognizing the superior ability of the trial court to judge the credibility of the witnesses." *Id.* (internal quotation marks omitted).

---

Appellants' motion to enforcement settlement, making it the proper subject for an interlocutory appeal under Rule 74.01(b).

[8] Appellants erroneously assert the facts of this case are uncontested, and thus, we should not defer to the trial court's findings. As Respondents correctly point out, the underlying facts are contested as the parties' arguments are centered around the trial court's factual determinations and ultimate conclusion that there was no meeting of the minds as to the settlement agreement. Due to Appellants' misapplication of our standard of review, they failed to follow the proper analytical framework in their brief, and thus, Respondents assert this is fatal to Appellants' appeal. While an appellant's "[f]ailure to follow the applicable framework means the appellant's argument is analytically useless and provides no support for their challenge[,]" our courts prefer to "dispose of a case following a meaningful consideration of the arguments rather than dismiss the matter due to other deficiencies." *Carpenter v. Carpenter*, 689 S.W.3d 765, 773 (Mo. App. W.D. 2024) (internal citations and quotation marks omitted).

10

## Analysis[9]

In Appellants' sole point on appeal, they argue the trial court erred in denying their motion to enforce settlement because there was a meeting of the minds regarding the priority of payment of debts and/or liens out of the equity of the Apartment.[10] Appellants assert that the dispute regarding lien priority occurred after a valid settlement agreement was reached via telephone conversation on October 26, 2023. We disagree.

"A motion to enforce a settlement adds to the underlying case a collateral action seeking specific performance of the agreement." *Matthes v. Wynkoop*, 435 S.W.3d 100, 106 (Mo. App. W.D. 2014) (internal citation and quotation marks omitted). As the moving party, Appellants must prove the existence of the settlement agreement "by clear, convincing and satisfactory evidence[.]" *Stickler v. McGinnis*, 649 S.W.3d 38, 43 (Mo. App. W.D. 2022) (internal citation and quotation marks omitted). "Evidence is clear and convincing if it instantly tilts the scales in the affirmative when weighed against the evidence in opposition, such that the fact finder's mind is left with an abiding conviction that the evidence is true." *Id.* at 44 (internal citation and quotation marks omitted).

Settlement agreements are governed by contract law, and thus, to enforce this purported settlement agreement, Appellants must prove the essential elements of a

---

[9] Respondents urge this Court to dismiss this appeal due to Appellants' various Rule 84.04 violations. Violations of Rule 84.04 constitute sufficient grounds for dismissal; however, "we have the discretion to review non-compliant briefs *ex gratia* where the argument is readily understandable." *Brown v. Brown*, 530 S.W.3d 35, 40-41 (Mo. App. E.D. 2017). Thus, we exercise our discretion to review this case on the merits.

[10] For ease of reference we refer to the issue of priority of payment of debts and/or liens simply as "lien priority" throughout the opinion.

contract: offer, acceptance, and consideration. *See Youngs v. Conley*, 505 S.W.3d 305, 313 (Mo. App. W.D. 2016). "A valid settlement agreement also requires a meeting of the minds and a mutual assent to the essential terms of the agreement." *Id.* "A mutual agreement is reached when the minds of the contract parties meet upon and assent to the same thing in the same sense at the same time." *Stickler*, 649 S.W.3d at 44 (internal citation and quotation marks omitted). To determine whether a meeting of the minds has occurred, we look at the objective manifestations of the parties. *See Matthes*, 435 S.W.3d at 107. "A determination of whether an offer has been accepted depends upon what is actually said and done; it does not depend on the understanding or supposition of one of the parties." *Grant v. Sears*, 379 S.W.3d 905, 917 (Mo. App. W.D. 2012) (internal citation and quotation marks omitted).

Our Courts have held that a determination of whether there was a meeting of the minds among parties is a question of fact for the trial court to decide. *See Stickler*, 649 S.W.3d at 44. "We defer to the findings of fact in a court-tried case, but we make an independent evaluation of the conclusions of law the trial court draws from its factual findings." *Id.* Neither party challenges the validity of the offer nor argues there was no consideration. Rather, the question presented is whether there was a valid acceptance of all material terms.

Beginning on October 17, 2023, the parties engaged in settlement negotiations consisting of various offers, counter-offers, and rejections. On October 25, 2023, Appellants sent the mediator a final settlement demand to be conveyed to Respondents. The following morning, the parties spoke on the phone and discussed each of the ten

12

terms listed in the final settlement demand. B.G. raised an issue as to one term, but the parties were able to reach a resolution as to that term during the call. Appellants argue a settlement agreement was reached at the conclusion of the call on October 26th because Respondents accepted all material terms of the agreement. Appellants further point to Respondents' failure to raise the issue of lien prioritization on the call, and argue lien priority was not a material term to the agreement. We find based on the evidence that the trial court did not err in finding that no settlement agreement was reached because there was no meeting of the minds regarding lien prioritization which was a material term of the settlement.

"Whether a term is material depends on the agreement and its context and also on the subsequent conduct of the parties including the dispute which arises and the remedy sought." *See Youngs*, 505 S.W.3d at 313 (internal quotation marks omitted). Upon review of the record, it is evident the issue of lien prioritization was material. Specifically, G.L. and Founder spoke several times before October 26th, and the issue of lien priority was the subject of at least one conversation. In the October 23, 2023 settlement demand, drafted by G.L., one of the provisions included, "The parties further agree that no lien on the property is superior to the class's Judgment lien with the sole exception of the first and second mortgages." Notably, this provision was removed from the subsequent October 25 settlement demand. In the text exchange, G.L. characterized the four-million-dollar stipulated judgment to Founder as a "paper number," and asserted that Founder "didn't care what the number [was] [because] equity was low . . . ." The evidence supported a finding that Founder interpreted this text to mean the stipulated

13

judgment would be collectible against insurance companies, and it would not impact the Apartment's other outstanding liabilities, and thus, Founder agreed to the cash demand and the stipulated judgment subject to these limitations. While there was conflicting evidence at the hearing about whether Founder made it clear to G.L. regarding Respondents' stance on lien prioritization and about whether G.L. agreed to subordinate the lien to any stipulated judgment, the trial court was free "to believe any, all of none of the evidence presented . . ." *Id.* (internal citation and quotation marks omitted). Although the trial court did not make specific findings regarding this evidence, "[a]ll fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." Rule 73.01(c). Therefore, we presume the trial court considered this contextual evidence of the agreement to support its conclusion that the issue of lien priority was "a material and/or essential term of a proposed settlement agreement between the parties."

The parties' subsequent conduct after the October 26th phone call further supports the trial court's conclusion. After the parties' phone call, B.G. visited G.L.'s office that afternoon to review the settlement documents. There was no language in the draft settlement agreement about lien priority, and Respondents asserted they would not agree to the settlement until this language was added. Appellants refused to add this language. Respondents repeated this request and Appellants again refused. Respondents again requested the addition of lien priority language and offered Appellants additional funds to go to the class if they agreed; Appellants did not accept. Appellants' unwillingness to add this language further indicates the issue of lien priority was material to the underlying

14

settlement agreement. *Cf. Youngs*, 505 S.W.3d at 315 (holding term was not material where parties willingly accommodated the request and the change did not materially affect the agreement).[11]

Appellants also point to the mediator's congratulations to the parties at the end of the call as evidence of Respondents accepting the final settlement demand. Whether the mediator believed there was a settlement is relevant but not dispositive of our analysis, as we must look to the *objective* manifestations of the parties. *See Matthes*, 435 S.W.3d at 107. Following the parties' phone call on October 26th, B.G. emailed the trial court that the parties reached a "tentative settlement agreement" and that the parties were in the process of finalizing terms and would let the trial court know when a final settlement was reached. Notably, G.L. was on this email thread, and he did not reply and/or argue that the parties had already reached a final settlement agreement. Only after B.G. refused to sign the draft documents and left G.L.'s office did G.L. email the trial court that there was a dispute and that Appellants believed an enforceable settlement agreement existed. Moreover, before B.G. went to G.L.'s office, B.G. communicated to G.L. that he sent the documents to his "clients to review/approve," and that he would stop by G.L.'s office later that day to "*hash out the final details*." (emphasis added). These communications

---

[11] In their reply brief, Appellants emphasize that "the purported lien priority issue related to a non-party (SPIG) who did not participate in the settlement negotiations or the underlying litigation[,]" to further support their position that lien priority was not a material term. As noted, Strategic and non-party SPIG lent money to Nephrite for the purpose of making improvements *to the Apartment*. Contrary to Appellants' assertion, Nephrite had a direct interest in prioritizing payment of its outstanding liabilities as the creditors' loans were used for the Apartment. Thus, it follows that Nephrite would want to prioritize paying its creditors from the Apartment's sale proceeds before the judgment lien was to be paid.

are indicative that the October 26th phone call was merely a part of ongoing settlement negotiations between the parties. *See Reppy v. Winters*, 351 S.W.3d 717, 721 (Mo. App. W.D. 2011) ("Negotiations or preliminary steps taken in an effort to come to an agreement . . . do not constitute a contract."). The fact the parties were still negotiating is also supported by G.L.'s response to B.G. as G.L. indicated that Founder would agree to the draft and asked if B.G. needed his other clients' approval. The trial court's finding that no agreement was reached during the October 26th phone call is supported by the parties' statements and actions. *See Grant*, 379 S.W.3d at 917. As the trial court stated: "Much was made by plaintiff regarding [B.G.]'s silence in reaction to [the mediator's] extension of congratulations to the attorneys in the phone call they had together. However, [B.G.]'s communications to the Court and [G.L.] through emails thereafter were much more significant in the evidentiary status of any settlement negotiations."

After our review of the record, we cannot say that the trial court's finding that there was not a meeting of the minds and a mutual assent to the essential terms of the settlement agreement during the parties' call on October 26th was erroneous. The trial court did not err in finding that Appellants "failed to prove the parties entered into an enforceable settlement agreement in this case." Appellants' point on appeal is denied.

16

**Conclusion**

The trial court's judgment that no settlement agreement was reached between the parties is affirmed and the cause is remanded for further proceedings.

_____
Gary D. Witt, Judge

All concur